**Donald SABIN, et al., Plaintiffs,**

v.

**REGARDIE, REGARDIE & BARTOW, et al., Defendants.**

Civ. A. No. 90–1891.

United States District Court, District of Columbia.

June 27, 1991.

D. Mitchell Basker, Law Offices of D. Mitchell Basker, Washington, D.C.

Edward L. Weidenfeld, Washington, D.C.

## MEMORANDUM AND OPINION

REVERCOMB, District Judge.

The plaintiffs publish a real estate directory for realtors in Florida, *The Real Estate Agents' INDEX of New Home Com-*

*munities* ("the INDEX"), and have for almost ten years. For over 20 years the defendants have published the *New Homes Guide* ("the New Homes Guide" or "Guide") for prospective buyers in the suburban Maryland area. Although the defendants' Guide is not published specifically for use by real estate agents, agents represent one third of the Guide's total circulation.

The following is a chronology of the events that led to this suit. On June 22, 1989, plaintiff Donald Sabin contacted the defendants to suggest that the two parties meet to discuss a possible joint venture in publishing a guide for real estate agents in the Washington area. The call lasted 2–3 minutes and was the first contact between the parties. The proposed meeting was held on June 23, 1989. The meeting lasted approximately one hour, during which time the defendants expressed interest in Sabin's proposal.

On June 26, 1989, Sabin called the defendants to acknowledge their general interest in the joint venture and to discuss the possibility of another meeting. The second meeting took place on July 21, 1989 and lasted for two hours. According to the plaintiffs, at the July 21 meeting the parties "essentially agreed" to the joint venture and specifically agreed to the following aspects of their proposed project:[1] they agreed to publish a joint directory; their agreement was to be for an infinite duration; the parties would share the costs and profits 50/50; the defendants were to be responsible for marketing/sales, office space and production facilities; and the plaintiffs were to "administer" the guide once in publication. To implement this "agreement", the parties decided that the plaintiffs would produce a *pro forma* of expenses and revenues for the joint venture and would send the defendants its *Index* media kit.[2] The defendants were not assigned any initial tasks at this meeting.

---

1. The defendants contest this version of the facts. They claim that they were unsure after the July 21 meeting what the plaintiffs were proposing. The defendants further assert that after the meeting they requested the plaintiffs to put the proposal in writing.

2. Sabin explained at his deposition that the media kit is available to anybody and "consists of a publication, a rate card, any brochure-type material, the tools that are used to sell the Index to an advertiser...." Deposition of Donald Sabin, taken April 2, 1991, at 117 (attached as Ex. A to

The next contact between the parties was on August 18, 1989. On that date, Sabin says he spoke with the defendants for fifteen minutes, during which conversation the defendants informed him that Washington area builders liked the idea of the proposed publication, explained that the defendants were showing the plaintiffs' *Index* around Washington, D.C., and gave Sabin certain financial information for use in preparing the *pro forma* for the project. Subsequently, the plaintiffs made three short calls to the defendants between August 18 and November 2, 1989 to "touch base". No *pro forma* was forwarded at any time to the defendants.

On November 3, 1989, Sabin called the defendants and learned that they had decided to publish a Washington, D.C. index without the plaintiffs. Plaintiffs filed this suit on August 9, 1990,[3] raising claims of copyright infringement, breach of contract, fraud and quantum meruit. The Court denied the defendants' Motion to Dismiss the plaintiffs' copyright infringement claims on October 4, 1990. The defendants have now moved for summary judgment as to all of the plaintiffs' causes of action. In addition, the plaintiffs have moved to add claims for violation of Section 2 of the Sherman Act; Contract, Combination and Conspiracy in Restraint of Trade; violation of the D.C. Antitrust Act; and tortious interference with plaintiffs' business. Finally, the plaintiffs have filed a Motion to Compel Discovery.

## I. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### 1. *Copyright Infringement*

The Court considered the merits of the plaintiffs' copyright infringement claim in its earlier order denying dismissal of that claim. In its October 4, 1990 Order, the Court refused to dismiss the claim without affording the plaintiffs an opportunity for discovery on the infringement issue. The Court held that the plaintiffs' Guide *format* was copyrightable but noted that

plaintiffs "may be hard-pressed, even through discovery and argument" to establish that the two guides are "substantially similar".

■ A high standard for determining "substantial similarity" applies to factual works which, by their nature, contain "a great many unprotectible facts and very little protectible expression of arrangement of those facts." *Cooling Sys. and Flexibles, Inc. v. Stuart Radiator, Inc.*, 777 F.2d 485, 491 (9th Cir.1985). The Ninth Circuit has held that "the author of a factual work ultimately must show that what has been taken from his expression is something more than what 'must unavoidably be produced by anyone who wishes to use and restate' the facts from the greater part of the work." *Id.* at 492 (citing *Landsberg v. Scrabble Crossword Game Players, Inc.*, 736 F.2d 485, 489 (9th Cir.), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 513, 83 L.Ed.2d 403 (1984)).

■ In justifying the plaintiffs' claim of infringement, Sabin claims

Defendants' Guide is substantially similar to the INDEX in the following manner: it duplicates my two-page format, it copies my separate treatment of community information and model information, the elements included in the community information section block are similar, (for example both publications include the name, address and telephone number of the community, phone numbers and hours of operation, price range of homes and information about nearby amenities such as schools and shopping), both publications have a separate Co-op Policy block and both publications contain floor plans and renderings of homes.

Pls. Omnibus Response to Defs. First Set of Interrogatories, at 7–8 (attached as Ex. G to Defs. Motion for Summary Judgment). The Court is not persuaded by this recitation and finds that the similarities between the parties' Guides are inevitable given the purpose of the publications. As the Court stated in its earlier Order, "[a]ny reason-

---

Defs. Motion for Summary Judgment) [hereinafter cited "Sabin Dep. at ___"].

**3.** The Complaint was amended August 13, 1990.

able person setting out to create such a guide would know to include the type of information presented in the plaintiffs' IN-DEX." Floor plans, phone numbers, price range, information about nearby amenities and the like are obvious elements of a real estate agent's guide. Equally apparent is the need to organize the Guide according to the different real estate communities, listing the models and policies for each community. As for the plaintiffs' two-page format, the Court does not find this to be a significant element of the INDEX's format; but, in any event, the format would seem obvious insofar as a publisher would try to group relevant information on opposing pages so that information would not be cut-out by the need to turn the page.

The Court finds that in this case, as in *Cooling Systems*, the alleged similarities between the plaintiffs' INDEX and the defendant's Guide are either "inevitable (and thus non-infringing) or trivial." *Id.* Therefore, as a matter of law, the Court holds that the defendants are entitled to summary judgment on the issue of copyright infringement.

### 2. Breach of Contract

The plaintiffs have asserted that the parties' alleged oral agreement was to last for an indefinite term. Sabin Dep. at 145. Accordingly, the defendants have raised the defense of the Statute of Frauds to the plaintiffs' breach of contract claim. Although the parties are in dispute as to the existence of an oral agreement concerning the plaintiffs' proposed joint venture, the plaintiff admits that the alleged agreement was never reduced to writing. In fact, Sabin testified at his deposition that "I was foolish enough not to get it in writing assuming we had a contract." *Id.* at 145.

The plaintiffs claim that this case falls within an exception to the writing requirement of the Statute of Frauds. Specifically, plaintiffs aver that they detrimentally relied on the existence of the joint venture agreement and, therefore, failure to enforce the contract would result in fraud. Because this argument is based on the

same theory of detrimental reliance that the plaintiffs' claim for fraud is based upon, the Court will address it in the next section.

### 3. Fraud

■ The parties agree that in order to recover on a theory of fraud, the plaintiffs must establish the following elements: 1) a false representation; 2) concerning a material fact; 3) made with knowledge of its falsity; 4) with intent to deceive; and 5) resulting in detrimental reliance by the plaintiff. *Barlow v. McLeod,* 666 F.Supp. 222, 228 (D.D.C.1986). In their opposition to the defendants' Motion for Summary Judgment, the plaintiffs filed affidavits from two former employees of the defendants which appear to establish the first four elements listed above. One affiant states that the defendant Charles Browning

> led Sabin to believe that they would do a joint venture with him. He said Sabin disclosed everything that the New Homes Guide needed to know to start an INDEX-type publication of their own.... He said they kept Sabin occupied thinking he was doing legwork for this project with them while they launched the book right under his nose.

Aff. of Susan Kimelman (attached as Ex. C to Pls. Opposition). Although this testimony largely establishes the plaintiff's fraud claim, the final element of the cause of action, detrimental reliance, also must be shown.

The plaintiffs claim the following reliance: Sabin expended time, money and energy into the project; Sabin sacrificed his own proposed publication in favor of the joint project; Sabin terminated discussions with all others interested in participating in such a project; Sabin abandoned all efforts individually to set up the IN-DEX; Sabin notified all other parties whom he had previously contacted that he was working with the defendants; and Sabin divulged specifics of the INDEX operation and projections of the economics concerning the venture in Washington in response to the defendants' request for a *pro forma*

and for a copy of the INDEX and its media kit. Pls. Opposition at 5–8.

In response to these claims, the defendants have noted several statements made during Sabin's deposition which contradict the plaintiffs' claims of reliance. These statements generally suggest that the plaintiffs were in no hurry to begin publication of a Washington D.C. guide and that they did little other than meet with the defendants to initiate the project. For example, Sabin testified that when he first began to work toward developing the Washington D.C. Index, "[he] wasn't in any rush to get the book started.... [He] was prepared to take up to a year to decide to go ahead and then get started" and that he "[a]ctually ... figured that a good time to really go out and start marketing the index would have been in the spring of 1990." Sabin Depo. at 121, 135.

The record similarly does not support the plaintiffs' claims that they abandoned all efforts individually to start-up a Washington, D.C. index and suspended all discussions with others interested in participating in the project. Sabin admitted that he had only engaged in the most preliminary preparations regarding the proposed index:

Q. Once you had decided in the late summer to fall of 1988 to move to the D.C. area, what steps did you take?

A. I initially started to look for specific people to contact.

Q. What sorts of people were those?

A. People responsible for marketing new home communities, people active in new home sales.

Q. Did you do anything else?

A. No.

Sabin Dep. at 79. Similarly, the record does not reflect that the plaintiffs had conducted any significant discussions with other parties. In answer to an interrogatory requesting the plaintiffs to identify persons with whom they discussed proposed joint efforts between June 1988 and the present, the plaintiffs listed two individuals, but the plaintiffs did not explain when and to what extent such discussions were held. In his deposition, Sabin testified that prior to his contact with the defendants, he had been contacted by two individuals interested in getting involved in the Washington D.C. index. Sabin Dep. at 82–85. These discussions were not initiated by Sabin; the only potential partner Sabin sought out were the defendants. *Id.* at 85. Moreover, Sabin never got beyond preliminary discussions with these individuals.[4]

■ Even assuming that the plaintiffs have met their burden of demonstrating reliance, the law requires that "[n]ot only must there be reliance but the reliance must be justifiable under the circumstances." *Prosser and Keeton The Law of Torts*, § 108, at 749 (W.P. Keeton, ed. 1984); *see also Isen v. Calvert Corp.*, 379 F.2d 126, 130 (D.C.Cir.1967). Viewing all of the plaintiffs' claims of reliance in the light most favorable to the plaintiffs, the Court nevertheless finds that reasonable jurors would not conclude that the plaintiffs' alleged reliance was justified in this case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.").

In reaching this holding, the Court relies on the following facts of record. First, as discussed above, prior to their meetings with the defendants, the plaintiffs had only engaged in preliminary consideration and preparations for the publication of a real estate agent's guide for the District of Columbia. Moreover, it appears from Sabin's deposition testimony that the defendants were capable of publishing the proposed INDEX without the plaintiffs' assistance:

---

4. Sabin told the first party, Richard Jacobs, that he was investigating how best to implement the idea and that he would advise Jacobs whether he "would want to do it with him, by myself, or with somebody else...." Sabin Dep. at 83. Although the second individual, Todd Ottenstein, indicated to Sabin that he was interested in a partnership, Sabin testified "I never indicated that I was interested in it." *Id.* at 84.

Q. What sort of experience were you going to supply in this venture?

A. Eight years of having done it, essentially. That is not to say that nobody else could have done it.

Q. Do you think anybody else could have done it?

A. Yes, I think so, if they understand what the Index is about.

\* \* \* \* \* \*

Q. The only thing you needed to know about the Index that wasn't clear from studying a copy of the Index was that you should use realtor relations representatives?

A. A very basic concept, yes....

Sabin Dep. at 99–100. As for the one concept that could not be ascertained from a study of the plaintiffs' Index itself—the use of realtor relations representatives—that concept apparently was not adopted by the defendants. Therefore, by his own testimony, the one piece of proprietary information which Sabin could have related to the defendants which they could not have discovered themselves was not even taken advantage of by the defendants in setting up their index.

The plaintiffs also have acknowledged that the defendants "had already set-up a system of identifying the builders ... in the D.C. area" and "had entered into relationships with many of these builders." Sabin Dep. at 132–33. Moreover, Sabin testified that the plaintiffs had no knowledge about the Washington, D.C. real estate market, area builders, or publishing techniques that the defendants did not have also. *Id.* at 146. In fact, when asked whether he had any idea why the defendants would have wanted the plaintiffs involved in the project rather than simply publishing the index themselves, Sabin answered: "No, none at all." *Id.* at 149.

It is apparent from this record that the defendants were in a position to publish the index proposed by the plaintiffs without the plaintiffs' input or participation. It follows, then, that had the plaintiffs entered the Washington, D.C. market without the defendants, they would have been in potential competition with the defendants. In light of these facts, it was at best naive of the plaintiffs to assume that a binding agreement had been reached between the parties after only two meetings, and it was commercial foolhardiness for the plaintiffs to rely on an alleged agreement where no writing memorializing the parties' understanding had been executed.

Although the plaintiffs have raised a jury question on the issue of whether they detrimentally relied on the defendants' alleged misrepresentations, the Court finds that there are insufficient evidentiary facts favoring the nonmoving party for a jury to conclude based on this record that such reliance was justified.[5] Accordingly, summary judgment is appropriate on both the plaintiffs' breach of contract and fraud claims.

### 4. *Quantum Meruit*

■ The plaintiffs' claim for recovery under a *quantum meruit* theory also is deficient. To recover under the quasi-contract theory, the plaintiffs must establish that they provided valuable services for the benefit of the defendant, which were accepted and used by the defendant, and which were rendered under such circumstances as reasonably notified the defendant that plaintiff expected to be paid for the services. In a business setting such as this,

Courts generally have refused to find unjust enrichment from services rendered without pay where the services were given during the negotiation phase of a commercial undertaking.

Where preliminary services are conferred for business reasons, without the anticipation that reimbursement will *directly* result, but rather with the expec-

---

5. The plaintiffs have filed a Motion to Compel discovery which concerns certain discovery questions which the defendants failed or refused to answer. The questions focus on the defendants alleged involvement in the use and trafficking of drugs, their alleged use of sexual solicitation to sell advertising, and allegations concerning a fraudulent pension scheme operated by the defendants. The Court does not reach this motion but notes that the discovery sought would not be relevant to this opinion.

tation of obtaining a hoped-for contract and incidental to continuing negotiations related thereto, quasi-contract relief is unwarranted.

*North Am. Fin. Group v. S.M.R. Enter.,* 583 F.Supp. 691, 700 (N.D.Ill.1984) (citations omitted).

■ The services which the plaintiffs claim to have rendered for the defendant are: (1) the *idea* of publishing an agent's INDEX in the District of Columbia; (2) Sabin's input into the parties' discussion of the viability of the proposed publication; (3) the suspension of the plaintiffs' work toward publishing such an INDEX in the District of Columbia area without the defendants; and (4) the plaintiffs' efforts to produce financial projections on the future joint publication. Pl. Opposition at 10–11. The plaintiffs argue that to allow the defendant to benefit from these services without paying for them would be "inequitable and unjust". However, even assuming these services benefitted the defendants, a fact disputed by the defendants, the plaintiffs have not established that they expected payment for the services. In fact, Sabin testified at his deposition that he did *not* intend to be paid for his work in this regard. Sabin Dep. at 110. Accordingly, the plaintiffs cannot now assert a claim for *quantum meruit.*

## II. CONCLUSION

For the reasons stated in the discussion above, the defendants' Motion for Summary Judgment is granted in all respects. In light of this ruling, the Court denies the plaintiffs' Motion to Amend Complaint. That motion sought to add certain antitrust and business tort claims which could not be sustained in light of this Court's holding, as a matter of law, that the plaintiffs were not justified in assuming that an oral agreement had been reached between the parties.[6]

---

**6.** The Court also notes that the defendants opposed this motion on the grounds that it fails to identify "recently discovered facts" which would

justify amendment of the Complaint at this stage of the litigation.