NOVECON, LTD., et al., Plaintiffs,

v.

BULGARIAN–AMERICAN
ENTERPRISE FUND,
et al., Defendants.

Civil Action No. 95–1178–LFO.

United States District Court,
District of Columbia.

June 26, 1997.

Douglas NcFadden, McFadden, Shoreman & Tsimpedes, P.C., Washington, DC, for Plaintiffs.

Gary H. Baise, Anson M. Keller, Baise & Miller, P.C., Washington, DC, for Defendants.

## MEMORANDUM

OBERDORFER, District Judge.

This case involves a failed real estate venture in Sofia, Bulgaria. Plaintiff Novecon, Ltd. ("Novecon") has brought suit against defendants Bulgarian–American Enterprise Fund ("BAEF") and two of its principal officers, Frank Bauer and Nancy Schiller. Novecon alleges primarily that BAEF breached an investment contract by failing to come forth with any promised funding. Currently pending are cross-motions for summary judgment. For the reasons stated below, the Motion for Summary Judgment filed by BAEF will be granted in part and denied in part, and the Motion for Summary Judgment filed by Novecon will be denied.

### I.

#### A.

Novecon is a private investment firm that specializes in structuring new business ventures in Eastern Europe. Plaintiff Richard W. Rahn is the President and CEO of Novecon. In 1991, Novecon and its Bulgarian partner, Mirpex Co., formed a joint venture called Southern Park Development ("SPD") in order to develop a real estate project in Sofia, Bulgaria. The SPD Project anticipated purchasing two parcels of land from a Bulgarian family—the Batsovs—and then using that land to build a residential, commercial, and parking complex. In November 1992, Novecon approached BAEF in order to request funding for the SPD Project.

BAEF is a not-for-profit corporation that was established by Congress to promote private sector development and entrepreneurship in Bulgaria. BAEF was authorized to disburse up to $55 million for investment in Bulgaria. Frank Bauer is the President and CEO of BAEF. Nancy Schiller is the Managing Director of BAEF's office in Chicago, Illinois.

#### B.

In November 1992, when Novecon submitted its initial Funding Proposal to BAEF, it contemplated that BAEF would act as a passive investor and merely provide financial

support. The Funding Proposal stated that the Batsovs had agreed to sell their two parcels of land to SPD in exchange for a 26 percent stake in the finished complex. The Proposal also set forth an anticipated schedule for development. On March 1, 1993, Schiller wrote to Novecon stating that the BAEF Board of Directors had approved further investigation into the Novecon proposal, but that a BAEF professional would be hired to act as a real estate consultant.

Subsequently, in May and June 1993, BAEF and Novecon exchanged correspondence on four different occasions. Novecon alleges that those four documents comprise the basis for a binding, enforceable contract. The documents are listed as follows:

(1) a Letter dated May 20, 1993 from Schiller to Ronald D. Utt, the managing director of Novecon:

(2) a reply Telefax dated June 1, 1993 from D. Utt to Schiller:

(3) a Letter dated June 3, 1993 from Schiller to Utt; and

(4) a reply Telefax dated June 3, 1993 from Utt to Schiller.

Each of those communications will be considered in detail.

First, the May 20, 1993 letter from Schiller to Novecon announced that BAEF was "prepared to move forward on the terms outlined in this letter." *See* Utt Aff. Ex. 10. The letter then stated that BAEF contemplated "a narrower oversight role for SPD than earlier anticipated." *Id.* at 2. Instead of managing the entire project, SPD would simply be compensated for reaching certain specified goals (*e.g.,* signing of the land sale contract, delivery of unencumbered title, transfer of title, securing zoning amendments and building permits, etc.). BAEF would be the principal party responsible for "chang[ing] the design of the building" and "serv[ing] as property manager for the development." *Id.* at 3. The letter also stated that the compensation arrangement would be *"[c]ontingent on the signing, of a definitive agreement." Id.* at 2 (emphasis added).

In response, Utt sent a telefax to Schiller dated June 1, 1993. The telefax proposed one amendment to the May 20 offer. Nove-con sought to "rearrang[e] the milestones" for which SPD would be compensated. *See* Utt Aff. Ex. 11. Other than that one change, however, none of the remaining terms of the offer were altered. At that point, the parties appeared ready to reach an understanding.

Also on June 1, 1993, however, Schiller was notified of an incident at the BAEF office in Sofia, Bulgaria. Apparently, three Bulgarian women had come into the office, claiming to be members of the Batsov family and asserting an ownership interest in the second parcel of land, known as Phase II. They stated that Alexander Batsov—the person with whom SPD had been negotiating—was *not* authorized to represent them in any attempted sale of that land.

Accordingly, on June 3, 1993, Schiller telefaxed a letter to Novecon raising two issues. *See* Utt Aff. Ex. 12. First, the June 3 letter proposed yet another fee structure for the compensation of SPD. The letter stated that the revised fee structure would be "include[d] in our request to the Fund's Board for *final* approval ..." *Id.* (emphasis added). Second, the letter stated that:

To our great concern, we have been informed by our Sofia office of a rather surprising development. Ms. Lilyana Batsova and two relatives stopped by the BAEF office to discuss Phase II of the project. They claim to have ownership interest in Phase II and have communicated to us that Mr. [Alexander] Batsov has not consulted with them, nor has he been granted the authority to represent them. It was not clear that they yet own the land or that they would work together.

If this is the case, I am sure you realize that the BAEF will not pursue this investment. . . . [T]he BAEF will consent to extending our negotiations until June 15, 1993 by which time we will expect certified documentation of the sign off of all heirs to both Phase I and II. If evidence is not received by June 5, 1993, the BAEF will rescind its *offer to negotiate* and terminate its discussions with SPD.

*Id.* at 2 (emphasis added).

On June 3, 1993, Utt replied in a telefax to Schiller, stating that:

On behalf of SPD, I accept the terms of the Fund's 20 May 1993 offer and the revised fee schedule. I also understand that your offer is contingent upon a resolution of any, and all outstanding uncertainties regarding ownership of both Phase I and Phase II sites, and accept responsibility to resolve the uncertainties to the Fund's satisfaction by the 15 June 1993 deadline.

*See* Utt. Aft. Ex. 13.

Thereafter, on June 4, 1993, a letter was telefaxed to the BAEF office in Sofia, Bulgaria. The letter was written in English and purportedly signed by Lilliana Batsova.[1] The letter states that "I express my written consent, as heir to the Batsov property to sign preliminary contract for phase II with SPD...." *See* Utt Aft. Ex. 14. Peculiarly, however, the letter was dated June 6, 1993— two days *after* it had already been received by the Sofia office.[2] Moreover, there is an affidavit in the record from Liliana Batsova, who swears that she "do[es] not understand English" and that an employee of Mirpex, Michael Tachev, mis-read her the letter in Bulgarian. *See* Second Batsova Aff. ¶ 3. Batsova avers that "I am amazed that Mr. Tache, has presented a wrong letter to me, and declare that I would have never signed it if I had been able to understand what it said. This letter is a fraud." *Id.* ¶ 4. In the affidavit of Michael Tachev, he asserts that "[a]t no time did I trick or deceive Liliana Batsova into signing a letter as described by her later affidavit." Tachev Aff. ¶ 2. In any event, Schiller states that the Batsova letter was "at the time considered to be sufficient proof that Phase II was doable on that score." Schiller Aff. ¶ 33.

Sometime thereafter, BAEF consulted with several architectural firms and began to realize that the potential for development on the SPD site was much greater than had been originally anticipated. On June 14, 1993, BAEF notified Novecon that it would proceed with the project, but only if the Batsovs accepted a 12 percent stake in the

finished complex, instead of a 26 percent stake. BAEF also informed Novecon that it would extend the June 15 deadline for obtaining firm commitments from the Batsov family until June 28, 1993. Finally, BAEF requested that Novecon cease soliciting funds for the SPD Project from any alternative sources. Novecon agreed to present the new "12 percent" offer to the Batsov family. It also agreed to cease soliciting funds from other prospective investors. *See* Utt Aff. Ex. 15.

On June 28, 1993, Novecon informed BAEF that it could *not* obtain the consent of all members of the Batsov family to sell their land for a 12 percent ownership stake. Nonetheless, in July 1993, a BAEF consultant, Toni Nelson, traveled to Bulgaria to examine the SPD site. According to Novecon, at that time, BAEF promised to provide detailed architectural plans for the complex. Those plans were necessary to obtain the requisite zoning amendments and building permits. BAEF contends, however, that even if the plans had been provided, it would have taken several additional months for the zoning amendments to proceed through public notice and comment. Since the SPD Project was already "well behind schedule." on November 2, 1993 BAEF informed Novecon that it was withdrawing from any further negotiations. *See* Utt Aff. Ex. 7.

## C.

Novecon filed its complaint in this case in June 1995. In January 1996, BAEF, Bauer, and Schiller sent letters to approximately 570 individuals and organizations in the United States and Bulgaria. Those letters contained the following statements:

It is likely that you recently read an op-ed piece that was published in The *Wall Street Journal Europe* that was critical of the [BAEF]....

The op-ed piece is one of several articles, all written by Mr. Greg Rushford, a paid professional writer. We find it odd that Mr. Rushford would choose to write

---

1. Ms. Batsova is alternatively referred to as Lilyana, Lilliana, or Liliana Batsova.

2. In his affidavit, Utt claims that he sent the letter to Schiller on June 6 or 7, 1993. He does not contest, however, that someone telefaxed the letter to the Sofia office on June 4, 1993.

about the [BAEF], and then devote nearly one-third of his opinion piece to a lawsuit by a Dr. Richard Rahn on behalf of a Washington, D.C. firm called Novecon. Dr. Rahn, through Novecon, seeks to extort $200,000 of U.S. taxpayer money from the BAFF as a fee for a real estate project that the BAEF rejected because it turned out to be a veritable "Brooklyn Bridge" of misrepresentation. Among other problems, Novecon's client did not own the land on which the project was to be developed—despite representations by Novecon to the contrary. Since there was nothing to sell, we did not buy their "Brooklyn Bridge."

*See* Rahn Aff. Ex. 19.

Novecon and Rahn contend that the letters were false and defamatory, particularly the statements that they were "seek[ing] to extort $200,000 . . . from the BAEF'" and that the SPD project was a "veritable 'Brooklyn Bridge' of misrepresentation." Subsequently, in February 1996, Novecon and Rahn amended their complaint to include a claim for defamation.

## II.

### A.

In its Motion for Summary Judgment, BAEF contends that it never entered into a binding, enforceable contract with Novecon. BAEF relies on the fact that the Schiller letters dated May 20, 1993 and June 3, 1993, expressly state that any agreement with Novecon would be subject to final approval by the BAEF Board of Directors. *See* Utt Aft. Ex. 10. at 2 (compensation arrangement would be "[c]ontingent on the signing of a definitive agreement"): Utt Aft. Ex. 12 (revised fee structure would be "include[d] in our request to the Fund's Board for final approval"). Accordingly, BAEF claims that Schiller lacked any authority to enter into a binding contract with Novecon.

 Novecon contends, however, that Schiller had "apparent" authority to bind BAEF. There is no question that she was an agent of BAEF, and "[a]pparent authority exists . . . to the extent that it is reasonable for a third person dealing with the agent to

believe that the agent is authorized." *See Williams v. WMATA,* 721 F.2d 1412, 1416 n. 7 (D.C.Cir.1983). In this case, however, it was *not* reasonable for Novecon to believe that Schiller was authorized to enter into contractual obligations on behalf of BAEF. On at least two occasions, Schiller expressly cautioned that her statements were subject to approval by the BAEF Board of Directors. Moreover, Novecon has not alleged any situation where Schiller ever implied otherwise. Accordingly, the statements in her affidavit are uncontested where she avers that "[a]t no time did I ever represent to Novecon, SPD, or Mirpex or anyone else for that matter, that I had the authority to legally bind the Fund. I did not have that authority in 1993 and I do not have that authority today." Schiller Aff. ¶ 2.

Novecon also contends that, even if there was no "apparent" authority, Schiller had "actual" authority, to bind BAEF. Novecon makes a puzzling reference to the "statement of authority given [to Schiller] by her boss." *See* Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., at 12. There is no evidence, however, of that so-called "statement of authority" in the record. Without any admissible evidence to support its claim of actual authority, Novecon cannot contradict Schiller's statement that "I did not have that authority [to bind BAEF] in 1993 and I do not have that authority today." *See* Schiller Aff. ¶ 2.

 Even assuming, *arguendo,* however, that Schiller did have either apparent or actual authority to bind BAEF, it appears as a matter of law that the correspondence from May to June 1993 did not create a binding, enforceable contract. BAEF cites the case of *Jack Baker, Inc. v. Office Space Development Corp.,* 664 A.2d 1236, 1238 (D.C.1995), where the D.C. Court of Appeals provided an insightful discussion on the issue of contract formation. The Court began by acknowledging that two parties may enter into a binding contract, even though they anticipate drafting a subsequent written memorialization. The only requirements for contract formation are (1) an agreement as to all material terms. and (2) an intention by both parties to be bound. *Id.*

■ Where there is no written draft of an agreement, however, it is the burden of the party asserting the contract to prove that a "meeting of the minds" occurred. "[T]his burden is particularly onerous." *Id.* " 'If the document or contract that the parties agree to make is to contain any material term that is not yet agreed on, no contract has yet been made; and the so-called 'contract to make a contract' is not a contract at all.' " *Id.* at 1239 (quoting Arthur L. Corbin. Corbin on Contracts § 2.8 (1993)). The Court in *Jack Baker* articulated five factors that it believed would be "useful to determine whether an oral agreement in contemplation of a written contract is enforceable." *Id.* Those five factors are appropriately considered here:

(1) whether the contract is one usually put in writing, (2) whether there are few or many details, (3) whether the amount involved is large or small, (4) whether it requires a formal writing for a full expression of the covenants and promises, and (5) whether the negotiations indicate that a written draft is contemplated as the final conclusion of negotiations.

*Id.* The Second Circuit has articulated a similar test and held that summary judgment is proper where the evidence on these factors is "overwhelmingly in favor of one position." *See R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69.77 (2d Cir.1984).

■ In this case, an analysis of the relevant factors indicates strongly that there was no binding contract. The negotiations here involved a complex real estate transaction in a foreign country. It is undoubted that such transactions are "usually put in writing." *See Jack Baker.* 664 A.2d at 1240: *see also R.G. Group.* 751 F.2d at 75 ("[A]bove a certain level of investment and complexity, requiring written contracts may be the norm in the business world...."). Second, this transaction involved numerous details that had yet to be finalized, e.g., the precise boundaries of the land parcels, a firm commitment from all the members of the Batsov family, and the precise date that title would transfer to BAEF.

Third, the amount of money involved ($200,000) was not insubstantial. Even putting dollar amounts aside, however, the importance of this transaction was reflected in the fact that BAEF declared that "Southern Park will be the first real estate development that the Fund undertakes in Bulgaria. It is essential that it be successful." *See* Utt Aff. Ex. 10 (the May 20 letter). Fourth, the complexity of this agreement, as noted above, indicates that "a formal writing [would be required] for a full expression of the covenants and promises." *See Jack Baker,* 664 A.2d at 1240.

Lastly and most importantly, the "negotiations indicate[d] that a written draft [wa]s contemplated as the final conclusion of negotiations." *Id.; see also R.G. Group.* 751 F.2d at 75 ("[W]hen a party gives forthright, reasonable signals that it means to be bound only by a written agreement, courts should not frustrate that intent."). *Id.* In this case, the two letters from BAEF, upon which Novecon relies in asserting the existence of a contract, both clearly indicate that a "definitive" or "final" written agreement was contemplated. "[I]t is not surprising that considerable weight is put on a party's explicit statement that it reserves the right to be bound only when a written agreement is signed. Courts are reluctant to discount such a clear signal, and it does not matter whether the signal is given during the course of bargaining, or at the time of the alleged agreement." *Id., see also Doll v. Grand Union Co.,* 925 F.2d 1363, 1370 (11th Cir. 1991) ("[W]e are unwilling to allow a jury to infer an agreement ... when one of the parties specifically declared its intention not to be bound until a lease was drafted and signed by both parties.")

■ In opposition, Novecon relies on the case of *NRM Corp. v. Hercules, Inc.,* 758 F.2d 676 (D.C.Cir.1985), and argues that subsequent actions taken by the parties—after the alleged contract was formed on June 3, 1993—indicate that the parties believed there was a binding contract in existence. Although Novecon contends that NRM is "factually akin" to this case, *see* Pl.'s Opp'n to Mot. for Summ. J., it is difficult to see where any kinship lies. In *NRM*, there was an *undisputed* contract between the two parties, in which NRM agreed to provide certain specialized machine tools to Hercules. *Id.* at

677 & nn. 2, 3; *see also id.* at 682 n. 17. The contract also contained a clause that allowed Hercules to change its specifications for the machine tools unilaterally. In the event of such a change, however, NRM was entitled to submit an "equitable adjustment" for the cost of those changes.

The central question in NRM was whether the term "equitable adjustment" included other, indirect costs—such as the costs created by delays in incorporating the unchanged parts. The Court concluded that the language in the contract was *ambiguous* and, therefore, summary judgment was inappropriate. The only reference in NRM that could be considered remotely applicable here is a footnote that discusses the formation of the contract. *See id.* at 682 n. 7. The Court stated that, although the contract was not finalized in any "particular document or statement." the "aggregate of communications ... indisputably led to a binding obligation to perform...." *Id.* By contrast, in this case, it is far from "indisputabl[e]" that the aggregate of communications resulted in a binding contract. The analysis in NRM does nothing to shed light on this dispositive issue.

Although the cases cited by Novecon are hardly on point. the argument concerning the subsequent actions taken by both parties is relevant. The Second Circuit in *R.G. Group* stated that where one party executes a "partial performance" of its obligations under the alleged contract and the other party accepts that performance, this factor should be taken into consideration to determine whether a binding contract existed. See *R.G. Group,* 751 F.2d at 75–76. "[P]artial performance is an unmistakable signal that one party believes there is a contract, and the party who accepts performance signals, by that act, that it also understands a contract to be in effect." *Id.: see also Viacom International, Inc. v. Tandem Productions, Inc.,* 368 F.Supp. 1264, 1270 (S.D.N.Y.1974) (partial performance is "strong circumstantial proof that the minds of the parties had met on the essential elements and that they were not waiting for a formal written instrument"). *aff'd,* 526 F.2d 593 (2d Cir.1975).

In this case, however, the facts indicate that none of the subsequent actions taken by Novecon or BAEF amounted to a partial performance or acceptance thereof. After June 3, 1993, Novecon continued to negotiate with the Batsov family, but those negotiations were never consummated. Nor was Novecon successful in obtaining any zoning amendments or building permits for the SPD Project. Thus, Novecon failed to reach any of the milestones set forth in the alleged contract. Furthermore, there was no acceptance on the part of BAEF with regard to any alleged partial performance rendered by Novecon. At most, Novecon merely *attempted* to effect partial performance. That fact alone, however, cannot stand against the overwhelming evidence that indicates the parties did *not* intend to be bound contractually until the completion of a formal, written agreement. Accordingly, since no reasonable trier-of-fact could find that a binding contract existed here, summary judgment is appropriate in favor of BAEF.

## B.

■ Novecon also contends, in the alternative, that it should be able to recover damages under the quasi-contractual theories of promissory estoppel and/or *quantum meruit.* Neither of those claims, however, can prevail. Under a theory of promissory estoppel, Novecon must be able to show that it relied *reasonably* on the promises given by BAEF. *See Bender v. The Design Store Corp.* 404 A.2d 194, 196 (D.C.1979). Yet the efforts here undertaken by Novecon were made in reliance on a "promise" that was expressly conditioned on ratification by the BAEF Board of Directors. *See Doll,* 925 F.2d at 1372–73.

In *Doll,* the Eleventh Circuit held that no reasonable trier-of-fact could find the element of reasonable reliance where the defendant had given "repeated caveats that it did not intend to be bound until a final lease agreement was signed." *Id.* at 1377. The Court noted that "[t]o hold otherwise would render potential [contracting parties] incapable of protecting themselves against liability during the course of negotiations." *Id.* at 1373. Similarly, in this case, Schiller re-

peatedly cautioned that BAEF did not intend to be bound until the execution of a final written agreement. Accordingly, there is no basis on which Novecon can contend that it acted reasonably by relying on the statements made by Schiller.[3]

The only situation where Novecon could plausibly argue that it relied reasonably was in its decision to forgo seeking alternative sources of funding for the SPD Project. In that instance, however, BAEF merely *requested* that Novecon cease its solicitations. There is no indication that any promise was made in connection with that request. Where a party does not make any promise, either express or implied, there can be no basis for a finding of promissory estoppel. *See Bender,* 404 A.2d at 196–197.

■ Next, with regard to the claim for *quantum meruit,* Novecon cannot show that it rendered any "valuable services" to BAEF. *See In re Rich,* 337 A.2d 764, 766 (D.C.1975) ("The essential elements for recovery [include] valuable services rendered . . . for the person sought to be charged. . . . ."). Although Novecon contends that it performed certain, unspecified "work" for BAEF, presumably referring to its preliminary negotiations with the Batsov family, it is clear from the record that such work—although causing a detriment to Novecon—resulted in nothing of value to BAEF. "[A] party's expenditures in preparation for performance that do not confer a benefit on the other party do not give rise to a restitution interest." *See* Restatement (2d) of Contracts § 370 cmt. (1981): *see also id.* illus. 2: E. Allan Farnsworth, Farnsworth on Contracts. § 3.26a, at 314 ("[T]he claimant must be able to show that its services resulted in all actual benefit to the defendant."). Accordingly, there is no basis for a finding of unjust enrichment.

Moreover, in *Sabin v. Regardie, Regardie & Bartow,* 770 F.Supp. 5 (D.D.C.1991), this District stated that:

"Courts generally have refused to find unjust enrichment from services rendered without pay where the services were given during the negotiation phase of a commercial undertaking.

Where preliminary services are conferred for business reasons, without the anticipation that reimbursement will directly result, but rather with the expectation of obtaining a hoped-for contract and incidental to negotiations related thereto, quasi-contract relief is unwarranted."

*See id.* at 10–11 (quoting *North American Financial Group, Ltd. v. S.M.R. Enterprises, Inc.,* 583 F.Supp. 691, 700 (N.D.Ill.1984)). That statement is directly applicable here. Thus, Novecon cannot obtain relief based on a claim of *quantum meruit.*

In sum, the undisputed facts in this case reveal a situation where both parties from the outset sought to develop a mutually profitable venture, but for one reason or another, were unable to reach a firm agreement. Both BAEF and Novecon expended significant resources, time, and effort during their negotiations, and it is only natural that there is now some measure of disappointment. Yet the record is clear that BAEF extended only an "offer *to negotiate.*" *see* Utt Aff. Ex. 12, at 2 (the June 3 letter from Schiller to Utt) (emphasis added). which Novecon "accepted." *see* Utt Aff. Ex. 13 (the June 3 letter from Utt to Schiller). That offer and acceptance constitutes nothing more than an agreement to continue negotiations, *i.e.,* an "agreement to agree," and Novecon cannot enforce any binding, legal obligations against BAEF.

### C.

■ Lastly, Novecon and plaintiff Richard Rahn, the President and CEO of Novecon, have brought a claim for defamation against BAEF, Schiller, and defendant Frank Bauer, the President and CEO of BAEF. That claim is premised on some 570 letters that were sent to various individuals and organizations regarding the SPD Project. BAEF has now moved for summary

**3.** Novecon does not raise the claim that it relied reasonably on an implicit "promise [by BAEF] to bargain in good faith." *See Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 73–74 (2d Cir.1989) (finding promissory estoppel in the absence of binding contract where plaintiff incurred out-of-pocket expenses during negotiations and defendant called off negotiations in bad faith); *see also* Corbin, *supra,* § 29. Accordingly. that argument will be deemed waived.

judgment, contending that. as a matter of law, the claim for defamation cannot stand. BAEF argues that Rahn is a "limited-purpose" public figure for the sake of First Amendment analysis. *See, Gertz v. Robert Welch, Inc.*, 418 LI.S. 323.351 (1974), and that the undisputed facts here do not support a finding of actual malice, *see New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

In *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287 (D.C.Cir.1980), the D.C. Circuit enumerated three factors to be considered in determining whether a plaintiff is a limited-purpose public figure: (1) there must be a public controversy: (2) the plaintiff must have achieved a special prominence in the debate; and (3) the alleged defamation must be germane to the plaintiff's participation in the controversy. *Id.* at 1296–98. Although Rahn purports to distinguish Waldbaum as a case involving a "media" defendant, the Supreme Court has indicated that the First Amendment applies with equal force regardless of whether the defendant is a member of the "established media" or not. *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 773–74 & n. 4, 105 S.Ct. 2939, 2952–53 & n. 4, 86 L.Ed.2d 593 (White.J., concurring): *id.* at 781–84, 105 S.Ct. at 2956–58 (Brennan.J., dissenting): *see also Vereen v. Clayborne*, 623 A.2d 1190, 1194–95 (D.C.1993).

In this case, BAEF contends that there was a public controversy regarding the performance of BAEF. Apparently, in November 1995, after this lawsuit was commenced. Rahn sent letters to various members of Congress, stating that:

> There is considerable evidence that the [BAEF], an agency of the U.S. government, has abused its fiduciary responsibility with taxpayer money that has been entrusted to them, does not have competent management, has conducted its activities in such a way as to give the appearance, if not the fact, of a conflict of interest among certain senior managers and members of the Board, has acted in a manner damaging to legitimate U.S. businesses; and has damaged U.S.-Bulgarian relations rather than improved them. Therefore, I

> respectfully request your staff to investigate and perhaps hold hearings on the above mentioned issues regarding the BAEF.

*See* Bauer Aff. Attach. BB: *see also* Bauer Reply Aff. Attach K. The letters sent by Rahn also described the poor performance of BAEF investments, detailed the failure of the Novecon/SPD Project, and intimated that certain officers and directors of BAEF had engaged in favoritism while making investment decisions. Subsequently, in January 1996, the *Wall Street Journal Europe* published an op-ed article that was critical of the investments made by BAEF, as well as its management style.

Based on the undisputed facts, it is clear that there was a legitimate public controversy regarding the performance of BAEF. Moreover, Rahn "achieved a 'special prominence' in the debate." *See Waldbaum*, 627 F.2d at 1297. By sending letters to members of Congress, Rahn "purposely tr[ied] to influence the outcome." *Id.* In addition, that influence was furthered by the fact that Rahn is apparently well-recognized among international economic circles due to his former positions as Vice–President and Chief Economist of the United States Chamber of Commerce. *See* Bauer Aff. Attach. FF.

Third, the allegedly defamatory letters sent by BAEF were in direct response to the comments made by Rahn and others. Accordingly, there is a nexus between the alleged defamation and Rahn's participation in the public controversy. Therefore, the three prerequisites have been satisfied in order to find, as a matter of law, that Rahn was a limited-purpose public figure.

In that situation, the constitutional protections of *New York Times v. Sullivan* apply. Rahn fails to point to any evidence that would support a finding of actual malice. In fact, the only cases cited by Rahn involve strictly private plaintiffs, who are not required to overcome any First Amendment hurdles in order to prove defamation. *See White v. Fraternal Order of Police*, 909 F.2d 512, 514–16 (D.C.Cir.1990): *Swengler v. ITT Corp.*, 993 F.2d 1063, 1071 n. 5 (4th Cir.1993). Accordingly, the claim for defamation raised by Rahn will be dismissed.

■ The argument with respect to Novecon (as opposed to Ralm), however, is somewhat more complicated. BAEF does not provide any substantial analysis as to whether Novecon should be considered a limited-purpose public figure. Rather, BAEF simply assumes *ipse dixit* that Novecon and Rahn are interchangeable. That assumption is without basis. The only supporting evidence is the fact that the letters written by Rahn to various Congressmen about BAEF was drafted on Novecon letterhead. Yet there is no indication that, as a result, Novecon achieved a "special prominence" in the debate, nor that it had a "position in the controversy" that could reasonably "have an impact on its resolution." *Waldbaum,* 627 F.2d at 1297. Accordingly, the Motion for Summary Judgment will be denied in part, and the claim for defamation raised by Novecon will be allowed to proceed.

### III.

Novecon has also moved for summary judgment, contending that the two counterclaims raised by BAEF must fail as a matter of law. Those counterclaims rest on allegations of promissory estoppel and negligent misrepresentation. BAEF has stated, however, that it will withdraw its counterclaim for promissory estoppel, if the Novecon claims based on similar grounds are dismissed. Since that contingency will come to pass, *see* Part II.B., *supra,* no further discussion of the first counterclaim is necessary.

With regard to the second counterclaim, the Motion for Summary Judgment filed by Novecon argues that BAEF "knew everything" prior to making its "offer" in May 1993. That argument merits little discussion. (In fact, Novecon itself devotes less than a page to asserting its own contentions.) The record indicates that there is a substantial issue of fact concerning whether Novecon misrepresented (1) the Batsov ownership of the property. and (2) the ease with which it could obtain zoning amendments for the SPD property. *See* Bauer Aff. ¶ 43–44, 46–47, 49. There is also a significant dispute over whether BAEF actually relied on those representations to its detriment. Accordingly,

the counterclaim for negligent misrepresentation will be allowed to proceed.

### ORDER

For the reasons stated in the accompanying Memorandum, it is this 25th day of June 1977 hereby

ORDERED: that the Motion for Summary Judgment [57–1] filed by defendant BAEF should be, and is hereby, GRANTED IN PART and DENIED IN PART: and that the claims for breach of contract, promissory estoppel, and *quantum meruit* are DISMISSED; and that the claim for defamation brought by plaintiff Richard Rahn is DISMISSED: and it is further

ORDERED: that the Cross–Motion for Summary Judgment [66–1] filed by plaintiffs Novecon, Ltd., et al., should be, and is hereby, GRANTED IN PART and DENIED IN PART: and that the counterclaim for promissory estoppel is DISMISSED: and it is further

ORDERED: that a status conference to discuss further administration of this case is scheduled for *July 15, 1997 at 10:00 a.m. in Courtroom 3.*