NOVECON, LTD., et al., Plaintiffs,

v.

**BULGARIAN–AMERICAN ENTERPRISE FUND, et al., Defendants.**

**Civil Action No. 95–1178–LFO.**

United States District Court, District of Columbia.

Sept. 16, 1997.

Douglas McFadden, McFadden, Shoreman & Tsimpedes, P.C., Washington, DC, for Plaintiff.

Gary H. Baise (D.C. Bar # 194878), Anson M. Keller (D.C. Bar # 324665), Baise & Miller, Washington, DC, for Defendants.

## ORDER

OBERDORFER, District Judge.

For reasons stated in the accompanying Memorandum, it is this 16th day of September 1997, hereby

ORDERED: that, upon reconsideration, defendants' motion for summary judgment on plaintiff Novecon's defamation claim should be, and is hereby, GRANTED; and it is further

ORDERED: that the defendants' counterclaim for negligent misrepresentation should be, and is hereby, DISMISSED; and it is further

ORDERED: that the complaint should be, and is hereby, DISMISSED.

## MEMORANDUM

A Memorandum and an Order of June 26, 1997 granted defendants' motion for summary judgment with respect to the contract issues and with respect to the defamation claim of plaintiff Richard W. Rahn, and denied plaintiffs' motion for summary judgment on defendants' counterclaim for negligent misrepresentation. *See Novecon, Ltd. v. Bulgarian–American Enterprise Fund,* 967 F.Supp. 1382 (D.D.C.1997). The ruling denied defendants' motion for summary judgment on the defamation claim of the corporate plaintiffs, Novecon, Ltd. and Novecon Management Co. (referred to hereinafter as if they were a single corporation), because there was no showing that the corporate entity, as distinguished from its chairman and CEO, Rahn, was a limited-purpose public figure. *See id.* at 1391.

Defendants have moved for reconsideration of the denial of summary judgment on the Novecon defamation claim. The original pleadings, argument, and consideration of that claim focused sharply on the classification of Rahn as a limited-purpose public fig-

Douglas McFadden, McFadden, Shoreman & Tsimpedes, P.C., Washington, DC, for Plaintiffs.

Gary H. Baise (D.C. Bar # 194878) Anson M. Keller (D.C. Bar # 324665) Baise & Miller, P.C., Washington, DC, for Defendants.

ure, with only passing reference to defendants' other grounds for summary judgment. An oral argument on that motion and post-argument filings by the parties persuade me that defendants' motion with respect to the Novecon defamation claim is well-taken. Given the prominent role that summary judgment rulings serve in the protection of First Amendment interests, *see Washington Post Co. v. Keogh,* 365 F.2d 965, 968 (D.C.Cir.1966), the defendants' motion will be granted and the remaining claims in this case will be dismissed.

## I.

The June 26 Memorandum relates the underlying contract dispute at the center of this litigation, which was resolved by the holding that no contract between the parties was, in fact, ever formed. The essential undisputed facts of the subsequent defamation claim are rather straightforward. Within a few months after Novecon filed its breach of contract action, BAEF received word that Rahn had visited the American ambassador to Bulgaria to discuss the lawsuit, that he had communicated with members of Congress about it, and that he intended to furnish *Forbes* magazine and several newspapers a letter or news release about the lawsuit and critical of BAEF. Shortly thereafter Rahn wrote members of Congress, charging that defendant BAEF,

> an agency of the U.S. government, has abused its fiduciary responsibility with taxpayer money that has been entrusted to them; does not have competent management; has conducted its activities in such a way as to give the appearance, if not the fact, of a conflict of interest among certain senior managers and members of the Board; has acted in a manner damaging to legitimate U.S. businesses; and has damaged U.S. Bulgarian relations rather than improved them. . . .
>
> . . . .
>
> The BAEF has not only damaged American companies doing business in Bulgaria, but has unnecessarily alienated many Bulgarian business people because of its incompetence and arrogance. . . .

. . . The evidence of mismanagement or worse is now abundant, and clearly an investigation is warranted.

Bauer Aff. Attach. BB at 1–2.

Robert Odle, an attorney with apparent access to and influence with BAEF, testified in an uncontroverted affidavit that he received a number of phone calls and other communications from Rahn, which Odle perceived as intended to reach BAEF. In these communications to Odle, Rahn disparaged BAEF and pointedly suggested that he would bring his criticisms to the attention of Congress, the State Department, and the press if BAEF did not settle this lawsuit. Odle also received from Rahn a two-page fax describing the litigation in what he judged to be a draft form of an op-ed article. Shortly thereafter, Rahn sent Odle the January 1996 issue of *The Rushford Report,* which featured a lead article highly critical of BAEF, along with a request to "[p]lease note the attached." Odle Aff. Attach. D.

At about the same time, the *Wall Street Journal Europe* published an op-ed article by Greg Rushford, the editor and publisher of *The Rushford Report,* entitled, "AID's Boondoggle in Bulgaria." The article charged that BAEF had wasted taxpayer money on staff salaries, expensive office space, computers, automobiles, accountants, and attorneys. It specifically reported about this lawsuit that "four high-priced lawyers" had appeared to argue BAEF's motion to dismiss—a fact that Rahn had previously told Odle "would make interesting reading in the press," according to notes taken by Odle's secretary. Odle Aff. ¶ 12. The article included a favorable profile of Rahn and criticism of BAEF's then-counsel in this case with some emphasis on the fact that counsel "declined repeated requests for their side of the story." Bauer Aff. Attach. GG. Several other newspapers in Bulgaria, including the country's largest, reprinted the allegations of the *Journal* article.

BAEF determined to defend its business reputation against Rahn's charges and the spate of negative publicity. (On a prior occasion, the Bulgarian National Bank had suspended BAEF's operations in Bulgaria for

over two months on the basis of an inaccurate news report.) Defendants circulated a package of information clarifying its position in this lawsuit to those whom they believed had received damaging information about BAEF. It is the cover letter to that communication which plaintiffs claim to be actionable. It stated in full:

> It is likely that you recently read an op-ed piece that was published in *The Wall Street Journal Europe* that was critical of the Bulgarian–American Enterprise Fund. Along with this piece, we are enclosing the BAEF's response which was printed on January 16, 1996 in the *Wall Street Journal Europe.*
>
> The op-ed piece is one of several articles, all written by Mr. Greg Rushford, a paid professional writer. We find it odd that Mr. Rushford would choose to write about the Bulgarian–American Enterprise Fund, and then devote nearly one-third of his opinion piece to a lawsuit by a Dr. Richard Rahn on behalf of a Washington, D.C. firm called Novecon. Dr. Rahn, through Novecon, seeks to extort $200,000 of U.S. taxpayer money from the BAEF as a fee for a real estate project that the BAEF rejected because it turned out to be a veritable "Brooklyn Bridge" of misrepresentation. Among other problems, Novecon's client did not own the land on which the project was to be developed—despite representations by Novecon to the contrary. Since there was nothing to sell, we did not buy their "Brooklyn Bridge".
>
> We know that you are interested in the activities of the BAEF and that you recognize the unique role of the Fund in helping to promote the private sector in Bulgaria. A lot of progress has been made—we are now in the process of funding our 500th investment—and we expect such progress to continue. As always, we appreciate your support and would be glad to discuss with you any issues relating to the BAEF and its operations.

Rahn Aff. Ex. 19.

As described in the affidavit of defendant Frank Bauer, BAEF's president and CEO, BAEF distributed this cover letter and package of information to over five hundred addressees—government officials in the United States and Bulgaria, individuals within foundations and enterprise funds, and others in Bulgaria with whom BAEF did, or hoped to do, business. Bauer Aff. ¶ 91–92.[1]

## II.

The June 26, 1997 Memorandum and Order classified Rahn as a limited-purpose public figure, but found the evidence insufficient to place Novecon, the corporation that he heads, in that category. *See Novecon, supra,* 967 F.Supp. at 1390–91. In their initial pleadings, none of the parties emphasized the independent role of Novecon in the BAEF public controversy or the application of the common law of defamation to the facts here.

In support of their motion for reconsideration, defendants have demonstrated that Novecon is a stand-alone, going concern with a corporate life of its own, including stockholders, directors, executives, and employees other than Rahn, and transacting in its own name and right. Originally, Novecon was the sole plaintiff in this lawsuit, which gave rise to the subsequent controversy underlying plaintiffs' claims of defamation; Rahn was joined as a plaintiff and counter-defendant at a later stage. Further analysis yields the conclusion that Novecon *qua* corporation was an accountable participant in, and putative beneficiary of, the dissemination of derogatory information about defendants. For example, settlement proceeds would have inured to the benefit of Novecon if, by fomenting a congressional investigation or by the threat of one, plaintiffs had persuaded defendants to settle the contract claim. Quite apart from Rahn, Novecon would profit

---

1. In an August 11, 1997 filing, plaintiffs objected to consideration of this affidavit because they have not learned the precise identity of all the recipients of BAEF's cover letter. Presumably they wish to conduct discovery with each such recipient. However, they have not filed the affidavit contemplated by Federal Rule of Civil Procedure 56(f), a requisite to mandated discovery in aid of opposition to a motion for summary judgment. Plaintiffs have thereby forfeited the privilege of discovery prior to summary judgment.

from successful prosecution of this lawsuit and suffer detriment from the loss of it.

It remains clear that Rahn's impressive resume is a factor in his public figure status that distinguishes him from the separate entity Novecon. But his status as a limited-purpose public figure is primarily a function of his role in the larger public controversy between Novecon and BAEF. In short, reconsideration of the undisputed facts in the record leads to the conclusion that Novecon is much more than Rahn's letterhead in this controversy. Because Novecon fired the first shot and would have been the principal beneficiary if plaintiffs had prevailed, it also qualifies as a limited-purpose public figure under the standard enunciated in *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287 (D.C.Cir.1980), as applied to . Rahn in the June 26 Memorandum. Absent a showing of actual malice, the defendants enjoy the right to say publicly what they said about their side of the controversy with Novecon, free from any threat of liability for defamation.

### III.

Defendants also persuasively contend in their motion to reconsider that they enjoy a common law privilege against defamation in order to defend the reputation of BAEF. Quite apart from the classification of plaintiffs as limited-public figures, defendants would have " 'a complete defense to libel, . . . [absent] the showing of malice' " under this asserted defense. *Columbia First Bank v. Ferguson*, 665 A.2d 650, 656 (D.C.1995) (quoting *Mosrie v. Trussell*, 467 A.2d 475, 477 (D.C.1983)). The parties did not develop this issue in their oral arguments and original pleadings, and the June 26 Memorandum did not reach it. Since "summary procedures are . . . essential" to guarantee robust discussion of public controversies, *Washington Post Co., supra*, 365 F.2d at 968, it is appropriate to address it now.

■ The common law privilege invoked by the defendants is rooted in Byron Parke's 1834 statement that a publication is not actionable when it is fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs in matters where his interest is concerned. This qualified privilege to protect or advance a defendant's own legitimate interests has been well described as "[r]oughly similar to the privileges of self-defense or the defense of property." *Prosser and Keeton on Torts* 825 (W. Page Keeton et al. eds., 5th ed.1984). "Thus," it is said, a defendant "may publish, in an appropriate manner, anything which reasonably appears to be necessary to defend his own reputation against the defamation of another including, of course, the allegation that his accuser is an unmitigated liar and the truth is not in him." *Id.* (footnote omitted).

■ The District of Columbia Court of Appeals has recently particularized these basic principles:

[T]o be actionable, [a statement] . . . must have been both false and defamatory. Even if a statement is defamatory, however, it may be protected by a qualified privilege if it is '(1) made in good faith, (2) on a subject in which the party communicating has an interest, . . . (3) to a person who has such a corresponding interest.'

*Columbia First Bank, supra*, 665 A.2d at 655 (citation omitted) (quoting *Moss v. Stockard*, 580 A.2d 1011, 1024 (D.C.1990)); *see also Collins v. Brown*, 268 F.Supp. 198, 200 (D.D.C.1967) (privileging statement when there is "a reasonable ground for making [it], either in the legitimate interest of the person uttering it, or of the person to whom it is communicated"). In this jurisdiction, as elsewhere, "[w]hether a statement is protected by a privilege is a question of law for the court." *Columbia First Bank, supra*, 665 A.2d at 655; *see also Mosrie, supra*, 467 A.2d at 477.

■ Here, BAEF's interest in defending its business reputation before U.S. government agencies, Bulgarian officials, and actual and potential business relations within the Bulgarian private sector is manifest. The foregoing facts demonstrate that plaintiffs themselves stimulated the interests of the governmental, media, and commercial parties who received defendants' allegedly defamatory communication. Plaintiffs initiated the lawsuit. It was they who went public with it,

their account embellished by derogatory remarks about defendants generally.

The common law qualified privilege asserted here does not demand that defendants demonstrate failsafe precision in identifying third parties with a sufficient interest in BAEF's public controversy. As the Restatement persuasively states the proposition:

If on an occasion giving rise to a conditional privilege the publisher mistakenly communicates the defamatory matter to some person to whom he is not otherwise privileged to publish it, he is protected if . . . he reasonably believes that the person to whom he communicates it is a person whose knowledge of the matter would be useful in the protection of the interest in question.

*Restatement (Second) of Torts* § 604 cmt. e (1977).

Defendants made a judgment call about the reverberations of Novecon's criticisms by media and word of mouth throughout the United States and in Bulgaria. They attempted to reach persons whose opinions of BAEF were, or reasonably could have been, affected by plaintiffs' comments and the ensuing wave of negative publicity. *See, e.g.,* Bauer Aff. ¶¶ 91–92. Appraised by a rule of reason, defendants' choice of recipients for its communication, as disclosed by the record, is sufficient to carry their burden under the common law qualified privilege.

## IV.

The question remains, as in most defamation litigation, whether plaintiffs have carried their burden of proving actual malice. Summarizing the District of Columbia law on the subject:

"[Malice is] the doing of an act without just cause or excuse, with such a conscious indifference or reckless disregard as to its results or effects upon the rights or feelings of others as to constitute ill will." But even a showing of ill will toward the plaintiff . . . "will not forfeit the privilege so long as the *primary* purpose is to further the interest which is entitled to protection." Thus, in deciding whether a particular statement is protected by a qualified privilege, we must "look[ ] to the primary motive by which the defendant is apparently inspired. . . ."

*Columbia First Bank, supra,* 665 A.2d at 656 (citations and footnote omitted.)

The June 26 Memorandum held that plaintiff "Rahn fail[ed] to point to any evidence that would support a finding of actual malice." *Novecon, supra,* 967 F.Supp. at 1390. Likewise, based on unrefuted facts in the Bauer, Rollins, and Schiller Affidavits, no reasonable trier of fact could find that defendants made and distributed their statement "without just cause or excuse, with such a conscious indifference or reckless disregard as to its results or effects upon the rights or feelings of [Novecon] as to constitute ill will." *Columbia First Bank, supra,* 665 A.2d at 656.

Plaintiffs' defamation claim focused principally on two phrases in defendants' cover letter: that "Dr. Rahn, through Novecon, seeks to extort $200,000 of U.S. taxpayer money from the BAEF," and that the original contract proposal amounted to "a veritable 'Brooklyn Bridge' of misrepresentation." [2] For example, plaintiffs charged, "Defendants

---

**2.** Plaintiffs raised objections to other portions of the letter. They alleged that the statement challenging ownership of the land offered for sale by Novecon's client and other insinuations of fraudulence on Novecon's part were false and defamatory. These allegations, of course, go to the substance of Novecon's contract claim. In light of the summary judgment order entered for defendants on June 26, it cannot be said that defendants acted with actual malice in communicating these remarks—remarks that conveyed the essence of its successful litigating posture in the contract phase of this case.

Plaintiffs also claimed that the letter falsely suggested that Novecon paid Greg Rushford to write the *Wall Street Journal Europe* article critical of BAEF. While a "defamatory imputation may be made by innuendo, by figure of speech, . . . [or] by allusion" as readily as by explicit language, *Restatement supra,* § 563 cmt. c, there is no basis in the record for reading BAEF's cover letter as creatively as plaintiffs did. At most, the letter implies that Rushford lacked the objectivity expected of a professional journalist and was unduly influenced by Novecon's perspective of its contract dispute with BAEF. While this implication might arguably damage Rushford's reputation, it does not defame any of the plaintiffs, who reasonably would be expected to present their point of view to the media in a

knew that plaintiffs had not been convicted of extortion and that what they were saying was false." Pls.' Br. in Opp. to Defs.' Mot. for Summ. J. at 23.

■ Yet nothing proffered by plaintiffs or apparent on the face of the challenged statements demonstrates "with convincing clarity" that defendants made false assertions of fact knowingly or recklessly. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 2515, 91 L.Ed.2d 202 (1986). No reasonable fact finder could conclude defendants believed, contrary to their litigating position here, that Novecon was entitled to the $200,000 fee it claimed or that the parties had formed a contract. Nor could a reasonable trier of fact fail to credit defendants' reasonable belief that Novecon's communications would, unless countered, seriously damage BAEF's status with the U.S. government which created it, Bulgarian officials who could control it, and other Bulgarians with whom it did or hoped to do business.

The Supreme Court established the constitutional threshold of "actual malice" for defamation actions brought by public figures (even limited-purpose ones, *see Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351, 94 S.Ct. 2997, 3012–13, 41 L.Ed.2d 789 (1974)) based on "the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasant sharp attacks...." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964). While the characterization of challenged statements as opinion does not confer an automatic and complete defense to defamation, *see Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20, 110 S.Ct. 2695, 2706–07, 111 L.Ed.2d 1 (1990), "allowance must be made for ' "imaginative expression" or the "rhetorical hyperbole" which has traditionally added much to the discourse of our Nation. ' " *Sigal Construction Corp. v. Stanbury*, 586 A.2d 1204, 1210 (D.C.1991) (quoting *Milkovich, supra*, 497 U.S. at 20, 110 S.Ct. at 2706).

This truth is certainly evident here. Defendants' reference to the "Brooklyn Bridge" was a figure of speech that reflected the defendants' assessment of Novecon's contract offer, obviously subject to many debatable interpretations. Similarly, the verb "extort" is capable of a variety of applications. Although not Webster's principal definition of the term, his Third New International Dictionary includes the following meanings:

> to obtain from an unwilling or reluctant person by importunity, argument, or ingenuity <[extort] a confession> <she did at last [extort] from her father an acknowledgment that the horses were engaged—Jane Austen> <[extorted] his resignation in exchange—Seymour Freidin> **b:** to elicit from someone unwilling by the obvious or apparent existence of an intrinsic compelling force <his intelligence [extorted] the admiration even of his worst enemies>

*Webster's Third New International Dictionary* 806 (1981).

Defendants' exercise of poetic license is protected by the First Amendment, as the Supreme Court's ruling in *Greenbelt Cooperative Publishing Association v. Bresler*, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970) makes clear. In *Bresler*, a prominent real estate developer—a public figure with respect to that litigation-petitioned a city council for a zoning variance while simultaneously negotiating with the city the sale of desirable real estate. State courts awarded Bresler a defamation judgment against a newspaper that had truthfully reiterated accusations of "blackmail" made in public hearings. Applying the "actual malice" standard, the Supreme Court reversed the judgment:

> It is simply impossible to believe that a reader who reached the word "blackmail" in either article would not have understood exactly what was meant: it was Bresler's public and wholly legal negotiating proposals that were being criticized. No reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging

most favorable light. Insofar as the letter suggests any direct connection between Rahn, Novecon, and Rushford, moreover, there is ample evidence in the record of Rahn's out-of-court

statements about BAEF and its pending litigation to warrant speculation about Novecon's "odd[ly]" favorable press coverage.

Bresler with the commission of a criminal offense. On the contrary, even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable.

*Id.* at 14, 90 S.Ct. at 1542 (footnote omitted).

Indeed, a recent *Washington Post* editorial repeated an accusation that a United States Senator was engaged in "ideological extortion." *See The Senate Capitulates,* Wash. Post, Sept. 16, 1997, at A16. It is inconceivable that a reasonable reader could interpret this statement as charging the Senator with the crime of extortion. *See also Old Dominion Branch No. 496, Nat'l Assoc. of Letter Carriers v. Austin,* 418 U.S. 264, 283–87, 94 S.Ct. 2770, 2780–83, 41 L.Ed.2d 745 (1974) (holding that word "traitor" in Jack London's definition of union scab, reprinted in union literature, did not give rise to defamation action under federal labor law); *Cafeteria Employees Union Local 302 v. Angelos,* 320 U.S. 293, 295, 64 S.Ct. 126, 127, 88 L.Ed. 58 (1943) ("[T]o use loose language or undefined slogans that are part of the conventional give-and-take in our economic and political controversies ... is not to falsify facts.").

Our Court of Appeals has read *Bresler* to emphasize "the importance of context, because it is in part the *settings* of the speech in question that makes their hyperbolic nature apparent, and which helps determine the way in which the intended audience will receive them." *Moldea v. New York Times Co.,* 22 F.3d 310, 314 (D.C.Cir.1994). In this case, defendants prepared the allegedly defamatory letter directly in response to criticisms in the international and Bulgarian news media, which defendants could reasonably trace to its dispute with Novecon. The letter introduced a package of material, including *The Wall Street Journal Europe* article critical of BAEF, "so that [recipients] could judge themselves." Bauer Aff. ¶ 90.

As a matter of law, therefore, the BAEF letter referred to limited-purpose public figures in a public controversy. It also enjoyed

a common law qualified privilege to use "rhetorical hyperbole, [and] lusty and imaginative expression" far short of actual malice. *Austin, supra,* 418 U.S. at 286, 94 S.Ct. at 2782. Accordingly, this reconsideration requires entry of summary judgment for defendants on Novecon's defamation claim.

\*　\*　\*　\*　\*　\*

The entry of summary judgment for defendants on plaintiffs' remaining claims leaves only defendants' counterclaim of negligent representation. In a July 23, 1997 letter,[3] defendants advised that they would withdraw their counterclaim if their summary judgment motion was granted in full and the order became final. Yet their proposed resolution—that their counterclaim be stayed pending the expiration of plaintiffs' time to appeal or until a final decision affirms the summary judgment dismissing the complaint—would prevent the entry of a final order necessary for plaintiffs to pursue an appeal. Since defendants have disavowed any regard for their counterclaim beyond the life of the other claims in this case their counterclaim will be dismissed for the failure to prosecute.

---

**3.** Plaintiffs objected to defense counsel's direct correspondence under Local Rule 106(b). Nonetheless, the rule permits an exception for correspondence requested by a judge. Defense counsel's commitment in the July 23 letter was requested by the Court on July 18, 1997.