NOVECON LTD., Novecon Management Company, and Richard W. Rahn, Appellants,

v.

BULGARIAN–AMERICAN ENTERPRISE FUND, Frank L. Bauer, and Nancy L. Schiller, Appellees/Cross–Appellant.

Nos. 97–7178, 97–7182.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 1, 1998.

Decided Sept. 3, 1999.

Rehearing and Rehearing En Banc Denied Oct. 25, 1999.*

* Circuit Judges Wald and Tatel did not participate in this matter.

Douglas B. McFadden argued the cause for appellants. With him on the briefs was John M. Shoreman.

Anson M. Keller argued the cause for appellees/cross–appellant. With him on the briefs was Gary H. Baise.

Before: WALD, SILBERMAN and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge GARLAND.

GARLAND, Circuit Judge:

The plaintiffs brought this diversity action charging breach of contract and defamation in connection with a failed real estate venture in Sofia, Bulgaria. The district court granted summary judgment in favor of defendants on both the contract and defamation claims. For the reasons stated below, we affirm the judgment of the district court.

## I

Plaintiffs Novecon, Ltd. and Novecon Management Company ("Novecon") are private firms engaged in developing business projects in Bulgaria, primarily through the use of joint ventures. Plaintiff Richard Rahn is president of both companies; Ronald Utt is their managing director. Defendant Bulgarian–American Enterprise Fund (BAEF or "the Fund") is a not-for-profit corporation established pursuant to the Support for East European Democracy Act, 22 U.S.C. §§ 5402, 5421. It promotes private sector development and entrepreneurship in Bulgaria through, among other things, grants, loans, and equity investments. Defendant Frank Bauer is the Fund's president and defendant Nancy Schiller is the managing director of its Chicago office.

## A

In 1991, Novecon formed a joint venture with a Bulgarian company to develop a residential and commercial building complex in Sofia, on land owned by the Batsov family.[1] In November 1992, it began negotiating with the Batsovs to transfer title to the land in exchange for a percentage of the project's finished units. Novecon also contacted BAEF and proposed that the Fund provide a construction loan to finance the development of the project. In March 1993, BAEF sent Novecon a letter indicating that the Fund's board of directors had "authorized continued conversations surrounding several real estate projects," including Novecon's. Joint Appendix ("J.A.") 144.

Between May 20 and June 3, 1993, BAEF and Novecon exchanged a series of four written communications concerning details of the project. The correspondence described the extent of Novecon's responsibilities in connection with the project, set forth a series of project milestones, and described the payments that Novecon would receive upon the completion of each milestone. The correspondence contemplated that the Batsov family would have a 26 percent stake in the building complex. Novecon contends that these four documents created a contract which bound BAEF to provide financing for the project.

The first letter, from Nancy Schiller of BAEF to Ronald Utt of Novecon, was written on May 20, 1993. J.A. 145. It stated that the Fund was "prepared to move forward on the terms outlined in this letter." The letter then described a "narrower oversight role" for Novecon than previously anticipated, listed a series of responsibilities that BAEF contemplated for Novecon, and noted that "this list is not exhaustive [but] should provide an overview of the role that [Novecon] will have." Schiller stated that "[c]ontingent on the signing of a definitive agreement,"

the Fund was willing to compensate Novecon with the sum of $200,000, "with payment based on timing and project landmarks." The first installment, of $25,000, would be made "[u]pon completion of: a) Contract signing, b) Delivery of unencumbered land title for Phase I and II, c) Transfer of the land title, [and] d) Securing and delivery of the zoning amendment." Schiller further stated that she and Mr. Batsov had agreed that the family would receive 26 percent of the building's apartments. She noted that "this document is fairly comprehensive, but undoubtedly there will be some need to clarify certain points now or as we proceed." Finally, Schiller said that the offer made in the letter would expire on June 4, 1993. *Id.*

On June 1, 1993, Utt sent Schiller a telefax reflecting their telephone conversation of the previous Friday. J.A. 148–49. The fax noted that Schiller had asked Novecon to revise the milestones "to advance the project and conform to Bulgarian law." Novecon's fax contained the revised milestones, as well as a series of revised fees, which Utt said he had "redone ... to better reflect the degree of difficulty in accomplishing the required tasks." He closed by stating that he "looked forward to [BAEF's] response." *Id.* at 149.

On June 3, 1993, Schiller sent Utt a revised fee structure which, she said, would be included "in our request to the Fund's Board for final approval" of the project. J.A. 150. Her letter stated, however, that "[o]ne important new issue has come up." Although BAEF had previously been told that Mr. Batsov represented all the heirs to the property, Ms. Lilyana Batsova and two relatives had just notified BAEF that they had an ownership interest and that Mr. Batsov did not represent them. "[I]f this is the case," Schiller said,

---

1. Novecon formed the joint venture, known as Southern Park Development, with Mirpex Co., a Bulgarian limited liability company. Southern Park Development has assigned its rights in this litigation to Novecon, Utt Aff. ¶ 76 (Joint Appendix ("J.A.") 76), and we refer to the joint venture as "Novecon" for ease of reference.

"I am sure you realize that the BAEF will not pursue this investment." In light of these developments, Schiller said that BAEF "will consent to extending our negotiations until June 15, 1993 by which time we will expect certified documentation of the sign off of all heirs." If evidence is not received by that date, she said, "BAEF will rescind its offer to negotiate and terminate its discussions with [Novecon]." *Id.*

The last of the four communications was a two-paragraph telefax sent by Utt to Schiller on June 3, 1993. J.A. 152. "On behalf of [Novecon]," he wrote, "I accept the terms of the Fund's 20 May 1993 offer and the revised fee schedule. I also understand that your offer is contingent upon a resolution of any and all outstanding uncertainties regarding ownership of [the building] sites, and accept the responsibility to resolve the uncertainties to the Fund's satisfaction by the 15 June 1993 deadline." Novecon contends that by accepting the terms of the Fund's May 20th letter and June 3rd revised fee schedule, this telefax "creat[ed] a binding contract." Am. Compl. ¶ 17.

On June 14, 1993, Schiller telephoned Utt and requested that he renegotiate the arrangement with the Batsov family to reduce their share in the project from 26 percent to 12 percent. To give Novecon time to negotiate, BAEF extended its deadline to June 28. On that date, however, Novecon advised BAEF that the Batsovs had refused to reduce their share. Novecon sought BAEF's "guidance as to how … to proceed," and offered to "extend the period of time during which we will not solicit other investors while you attempt to work this out." J.A. 157–59.

Finally, on November 2, 1993, BAEF wrote Novecon that "since our agreement to negotiate the project expired on June 28, 1993, we have decided to terminate negotiations." J.A. 160. The letter noted that the local court in Sofia had delayed judgment on Lilyana Batsova's property claim, that BAEF had not received a contract signed by the Batsov family agreeing to turn over the property, and that numerous zoning issues regarding the land remained unresolved. "Basically," BAEF wrote, "the project has proven unfeasible." *Id.*

In June 1995, Novecon (and Rahn) filed suit in the United States District Court for the District of Columbia, asserting jurisdiction based on the diversity of the parties' citizenship. The complaint alleged three contract-related claims: breach of contract, promissory estoppel, and quantum meruit. It contended that by accepting the terms of the Fund's May 20th letter and June 3rd revised fee schedule, Novecon's June 3rd telefax created a binding contract, and that the Fund's insistence on renegotiating the Batsov family's share breached the contract and caused the project to collapse.

**B**

The second phase of the case, culminating in the filing of an amended complaint for defamation, began soon after Novecon filed its original contract action. In October of 1995, BAEF received a two-page document which, it was told, Richard Rahn of Novecon had given to the American Ambassador to Bulgaria. BAEF construed the document as a draft for publication. Bauer Aff. ¶ 77 (J.A. 464). The document generally attacked BAEF, and contended that "[a]llegations of conflict of interest and theft of project ideas by individuals close to the senior staff have been made." J.A. 525–26. It then proffered the "example of … the Novecon company." According to the document, "[a]fter signing the contract with Novecon," BAEF "proceeded to change the project so that Novecon with its partners could no longer obtain the necessary agreements and approvals in Bulgaria … [and] then refused to compensate Novecon for losing the project." Moreover, it said, "Dr. Rahn has been told that the BAEF strategy is to bleed Novecon with legal bills because the BAEF's legal costs are paid by the taxpayers." The document also noted that "Rahn

has written members of Congress requesting hearings and an investigation" of the Fund. *Id.* at 526.

In November of 1995, Rahn did send letters to members of Congress, on Novecon stationery. J.A. 529–30. In those letters, he wrote that "[t]here is considerable evidence that [BAEF] has abused its fiduciary responsibility with taxpayer money . . . ; does not have competent management; has conducted its activities in such a way as to give the appearance, if not the fact, of a conflict of interest . . . ; has acted in a manner damaging to legitimate U.S. businesses; and has damaged U.S. Bulgarian relations." Rahn offered the Novecon case as an example, stating, in words paralleling the October draft discussed above, that "[a]fter signing the contract with Novecon . . . the BAEF then proceeded to change the project so dramatically from the approved plans that the necessary agreements and approvals in Bulgaria could no longer be obtained." BAEF then "refused to do the appropriate and honorable thing—compensate Novecon" for its losses. The letter further contended that BAEF's "strategy is to bleed Novecon with legal bills because the BAEF's legal costs are paid by the taxpayers." And it specifically charged that "just last week the BAEF brought four lawyers . . . to a hearing in Washington in another unsuccessful attempt on their part to have our case dismissed on technicalities." In closing, Rahn accused BAEF of "incompetence and arrogance" and "mismanagement or worse," and urged a congressional investigation. *Id.*

On January 5–6, 1996, the *Wall Street Journal Europe* published an op-ed piece by an author named Greg Rushford, entitled "AID's Boondoggle in Bulgaria." J.A. 291. The Rushford piece made several of the charges contained in the October draft and the November Rahn letter. It accused BAEF of "arrogance" and "shoddy performance," stemming "largely from a management cadre who spend most of their time drawing big salaries in comfortable offices." Four paragraphs of the article discussed the dispute between BAEF

and Novecon. It noted that "Mr. Rahn, a respected former chief economist at the U.S. Chamber of Commerce, accuses the BAEF of breaching a contract to fund a residential and commercial real estate project in Sofia . . . [by] constantly trying to alter the deal's terms until they caused the project to collapse." The article quoted Ronald Utt, Novecon's managing director, as stating that "[w]e could have gotten a perfectly suitable Bulgarian architect for $15,000, but BAEF decided they wanted a Chicago architect," and that BAEF was "in over their heads." It charged that "armed with tax dollars, [BAEF was] busy employing petty litigation tactics against Novecon." And it specifically charged—as had the Rahn letter—that BAEF sent "four high-priced lawyers into federal court to fight over dubious claims about standing and venue." *Id.*

On January 15, 1996, the Bulgarian newspaper *24 Hours* ran two stories related to the BAEF–Novecon dispute. *See* J.A. 785–89 (translations). The first discussed the Rushford article's analysis of BAEF's financial excesses and poor performance. In that article, the reporter noted that BAEF "became notorious for the big salaries of the employees, the fancy offices in Chicago and the $200,000 that the 'Novecon' owner, Richard Rahn, lost in a deal with the Fund." The second article focused specifically on the Novecon litigation as reported by Rushford. It repeated Rahn's claim that BAEF frustrated the parties' agreement by repeatedly trying to alter the terms of the project. It also repeated Utt's contention that BAEF had insisted that the architect be American. The article concluded by noting that Rushford believed it was not worth hiring expensive lawyers for a $200,000 case, and that BAEF's strategy was to cause delays and large court expenses. *Id.*

Immediately after receiving the op-ed piece, BAEF sent the *Wall Street Journal Europe* a letter responding to Rushford's allegations. The *Journal* published the response as a letter to the editor on January 16, 1996. J.A. 796. BAEF's letter set

forth several assertedly factual inaccuracies about BAEF contained in the Rushford article. Its sole reference to Rahn and Novecon appeared in the final two sentences: "Richard Rahn, whose lawsuit against us receives excessive attention in the article, is entitled to and will have his day in court. It is unfortunate that the *Wall Street Journal Europe* has been used as a forum to buttress an otherwise meritless complaint." *Id.*

Thereafter, on January 18, 1996, BAEF sent a package of materials to 570 individuals and organizations in the United States and Bulgaria. The package sent to Americans contained the Rushford article and BAEF's letter to the editor; the Bulgarians received a copy of the *24 Hours* article as well. The cover letter, which is the focus of Novecon's defamation claims, stated in relevant part:

> We find it odd that Mr. Rushford would choose to write about the Bulgarian–American Enterprise Fund, and then devote nearly one-third of his opinion piece to a lawsuit by a Dr. Richard Rahn on behalf of a Washington, D.C. firm called Novecon. Dr. Rahn, through Novecon, seeks to extort $200,000 of U.S. taxpayer money from the BAEF as a fee for a real estate project that the BAEF rejected because it turned out to be a veritable "Brooklyn Bridge" of misrepresentation. Among other problems, Novecon's client did not own the land on which the project was to be developed— despite representations by Novecon to the contrary. Since there was nothing to sell, we did not buy their "Brooklyn Bridge."

J.A. 169.[2]

Following the circulation of the BAEF letter, Novecon and Rahn amended their complaint to add a charge of defamation, focusing particularly on the allegations that they had sought to "extort $200,000 of taxpayer money," and that the project was a "veritable Brooklyn Bridge of misrepresentations." Am. Compl. ¶ 33 (J.A. 359); *see* Rahn Reply Aff. ¶ ¶ A, B (J.A. 295).

### C

The district court issued three opinions which together granted summary judgment against Novecon and Rahn on all counts. In the first opinion, the district court granted summary judgment on the contract claims. *Novecon v. BAEF ("Novecon I")*, 967 F.Supp. 1382 (D.D.C. 1997). The court held that the letters exchanged by Novecon and BAEF were insufficient to allow a reasonable trier of fact to find a contract between the parties, and rejected Novecon's alternative argument that it was entitled to damages on theories of promissory estoppel or quantum meruit. The court concluded: "[T]he record is clear that BAEF extended only an 'offer *to negotiate*' which Novecon 'accepted' ... [and which] constitutes nothing more than an agreement to continue negotiations.... Novecon cannot enforce any binding, legal obligations against BAEF." *Id.* at 1389.

In its first and second opinions, the district court also granted summary judgment against plaintiffs' defamation claim, for two reasons. The court held that BAEF's letters were entitled to First Amendment protection because plaintiffs were "limited-purpose public figures" and had failed to show defendants had acted with the kind of malice necessary to overcome the constitutional privilege. *Novecon v. Bulgarian–American Enterprise Fund ("Novecon II")*, 977 F.Supp. 45, 49 (D.D.C.1997); *Novecon I*, 967 F.Supp. at 1390 (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)).[3] The court also held

2. According to BAEF, the letters delivered to the American and Bulgarian recipients were largely identical, with the exception of the Brooklyn Bridge reference which was omitted from the letters to the Bulgarians because it would not have been understood. *See* J.A. 795.

3. In *Novecon I* the court found only Rahn to be a limited-purpose public figure. *See* 967 F.Supp. at 1390–91. In *Novecon II* it found Novecon to be one as well. *See* 977 F.Supp. at 49.

that BAEF's letters were protected by the common-law privilege of self-defense, and that Novecon had failed to show defendants had acted with the kind of malice necessary to overcome that privilege. *Novecon II,* 977 F.Supp. at 49–52. Finally, in its third opinion, the court rejected plaintiffs' motion under Fed.R.Civ.P. 56(f) to deny or stay summary judgment in order to permit Novecon to obtain additional discovery. *Novecon v. Bulgarian–American Enterprise Fund ("Novecon III"),* 977 F.Supp. 52, 53–54 (D.D.C.1997).

## II

We begin with plaintiffs' contract-related claims. We review the district court's grant of summary judgment *de novo. Hunter–Boykin v. George Washington Univ.,* 132 F.3d 77, 79 (D.C.Cir.1998). We may uphold that grant only if "no reasonable fact-finder could conclude that an enforceable" contract existed between the parties. *Jack Baker, Inc. v. Office Space Dev. Corp.,* 664 A.2d 1236, 1241 (D.C.1995); *see Ekedahl v. COREStaff, Inc.,* 183 F.3d 855, 857–59 (D.C.Cir.1999).

### A

■ Under the law of the District of Columbia, "for an enforceable contract to exist there must be both (1) agreement as to all material terms; and (2) intention of the parties to be bound." *Jack Baker,* 664 A.2d at 1238. The party asserting the existence of an enforceable contract bears the burden of proof on the issue of contract formation. *See id.; Ekedahl,* 183 F.3d at 858–59. "Where the parties contemplate a subsequent written contract, this burden is particularly onerous." *Jack Baker,* 664 A.2d at 1238.

■ Plaintiffs contend that the four corners of the contract between Novecon and BAEF may be found in the four communications the parties exchanged between May 20th and June 3, 1993. Novecon Br. at 18. Specifically, Novecon contends that by accepting the terms of the Fund's May 20th letter and June 3rd revised fee schedule, Novecon's June 3rd telefax "creat[ed] a binding contract." Am. Compl. ¶ 17 (J.A. 354); Utt Aff. ¶ 23 (J.A. 76).[4] Having searched those four corners, we do not find a contract within them.

Novecon's first letter, dated May 20, 1993, stated that the terms it contained provided an "overview" but were not "exhaustive," and that "undoubtedly there will be some need to clarify certain points now or as we proceed." J.A. 146–47. The first payment would be made, the letter said, only "[u]pon completion of: a) Contract signing, b) Delivery of unencumbered land title for Phase I and II, c) Transfer of the land title, [and] d) Securing and delivery of the zoning amendment." The Fund's willingness to compensate Novecon, it stressed, was "[c]ontingent on the signing of a definitive agreement." *Id.*

BAEF's second letter, dated June 3, 1993, was no more definitive. *See* J.A. 150–51. First, it said that a "revised fee structure" would be "include[d] in our request to the Fund's Board for final approval," thus indicating that there was at least one more stage required before BAEF could enter into a contract. Second, BAEF made clear that its offer would be rescinded unless it received "certified documentation of the sign off of all [Batsov] heirs by June 15, 1993." Finally, and most significant, BAEF expressly characterized its offer as an "offer to negotiate." *Id.*

■ In light of the plain language of these letters, and BAEF's own characterization of its offer, we agree with the district court's conclusion that "BAEF extended only an 'offer *to negotiate,*'" and that when Novecon accepted that offer on June 3rd it created "nothing more than an agreement to continue negotiations." 967 F.Supp. at 1389; *see generally Bender v. Design Store Corp.,* 404 A.2d 194, 197 (D.C.1979) ("All that was promised was that appellee would bargain in good

---

**4.** The remaining communication, the June 1st fax from Novecon to BAEF, proposed a revision of the fee schedule originally contained in the Fund's May 20th letter. J.A. 148–49.

faith."). The letters made clear that they did not contain all terms material to an agreement, and that those terms would be contained in a "definitive agreement" to be finalized at the "contract signing" expressly contemplated in the May 20th letter. *See* 967 F.Supp. at 1387. In the District of Columbia, "parties will not be bound to a preliminary agreement unless the evidence presented clearly indicates that they intended to be bound at that point." *Jack Baker*, 664 A.2d at 1239. There is no such evidence here.

There are other significant indications of nonfinality as well. One is the June 3rd letter's reference to the fact that the terms would have to be submitted to the Board for "final approval." *See Jack Baker*, 664 A.2d at 1237, 1241 (describing requirement that Philippine embassy construction contract "will be subject to the approval of the Philippine Department of Foreign Affairs" as "striking" indication of nonfinality). A second is that this was the sort of complex, expensive, multi-stage transaction in which a subsequent formal contract would ordinarily be expected. *See id.* at 1240–41; *see also R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir.1984).

Finally, BAEF's letter made clear that there were a number of key contingencies that would have to be satisfied before the agreement could be concluded. First among these was the transmission of "certified documentation of the sign off of all [Batsov] heirs." J.A. 151. Indeed, in accepting "the terms of the Fund's" offer on June 3rd, Novecon acknowledged its understanding that agreement was "contingent upon a resolution of any and all outstanding uncertainties regarding ownership of [the building] sites," and "accept[ed] the responsibility to resolve the uncertainties to the Fund's satisfaction by the 15 June 1993 deadline." *Id.* at 152. Yet, as Novecon notes in its brief, those uncertainties were never resolved. Novecon Br. at 24.

In sum, we agree with the district court that no reasonable trier of fact could conclude that the exchange of communications between Novecon and BAEF constituted an agreement by both parties to be bound by their terms. Rather, the letters were "merely a part of the preliminary negotiations looking toward the execution of a contract in writing and by [their] own terms negate[d] the idea that [they] were intended as an offer which thereafter could be accepted ... without the necessity of a formal written document covering all the terms." *Simplicio v. National Scientific Personnel Bureau, Inc.*, 180 A.2d 500, 502 (D.C.1962).

**B**

As an alternative to its breach of contract claim, Novecon contends that it is entitled to relief on either of two related theories: promissory estoppel or quantum meruit. The core requirements of those theories, however, are absent here.

Novecon argues that it "reasonably relied to [its] detriment on the Fund's promises to provide" funding for the project, and that in reliance on those promises it "expended considerable amounts of time and money." Am. Compl. ¶ 42. Although "for purposes of estoppel, a promise need not be as specific and definite as a contract, ... in the final analysis there must be a promise"—and it must be more than merely a promise to "bargain in good faith." *Bender*, 404 A.2d at 196–97. For the reasons stated above, we can find no greater promise here.

Novecon also contends that it is entitled to recover on a theory of quantum meruit or unjust enrichment for the benefit it conferred on the Fund by "perform[ing] valuable services for the Fund in connection with efforts to develop" the project. Am. Compl. ¶ 45. To prevail on such a claim, a party "must show that the services [it performed] were beneficial to the recipient." *Fred Ezra Co. v. Pedas*, 682 A.2d 173, 176 (D.C.1996); *In re Rich*, 337 A.2d 764, 766 (D.C.1975) ("The essential elements for recovery ... [include] valuable services being rendered ... for

the person sought to be charged."). Novecon alleges that "[t]he benefit[s] derived by BAEF" were Novecon's "(1) meeting with the landowners to try to negotiate a different percentage of the deal and (2) meeting with Bulgarian officials to obtain zoning for the project." Novecon Br. at 25. But "a party's expenditures in preparation for performance that do not confer a benefit on the other party do not give rise to a restitution interest." Restatement (Second) of Contracts § 370 cmt. a (1980); see Richardson v. Green, 528 A.2d 429, 438 n. 12 (D.C.1987) (holding that plaintiff may not recover if "defendant received no value"). Here there is insufficient evidence that the Fund received a valuable benefit from Novecon's unsuccessful efforts to negotiate with the Batsovs and Bulgarian officials.

### III

We turn next to Novecon's defamation claim, which is based on the cover letter BAEF sent to 570 individuals and organizations in the United States and Bulgaria. The letter enclosed the *Wall Street Journal* and *24 Hours* articles, as well as BAEF's letter to the editor. The allegedly defamatory statements were the cover letter's contentions that:

> Dr. Rahn, through Novecon, seeks to extort $200,000 of U.S. taxpayer money from the BAEF as a fee for a real estate project that the BAEF rejected because it turned out to be a veritable "Brooklyn Bridge" of misrepresentation. Among other problems, Novecon's client did not own the land on which the project was to be developed—despite representations

by Novecon to the contrary. Since there was nothing to sell, we did not buy their "Brooklyn Bridge."

J.A. 169. The district court dismissed this claim on the basis of both First Amendment and common-law privileges. As we find the common-law privilege sufficient to sustain the dismissal, we do not address BAEF's First Amendment argument.

■■■■ The District of Columbia recognizes "self defense" as a qualified privilege constituting a complete defense to a claim of libel or defamation. *See Mosrie v. Trussell,* 467 A.2d 475, 477 (D.C.1983); *Dickins v. International Bhd. of Teamsters,* 171 F.2d 21, 24 (D.C.Cir.1948). "When the author of a libel writes ... for the protection of his own rights or interests, that which he writes is a privileged communication unless the writer be actuated by malice." *Dickins,* 171 F.2d at 24. "[T]he existence of the privilege is a question of law for the court[;] whether it was abused by the defendant, is a question of fact for the jury." *Mosrie,* 467 A.2d at 477; *see Columbia First Bank v. Ferguson,* 665 A.2d 650, 655 (D.C.1995); *Altimont v. Chatelain, Samperton & Nolan,* 374 A.2d 284, 290 (D.C.1977).

■■■■ There is no question but that the privilege applies in this case. BAEF and its management had been subjected to serious attacks in letters to Congress and articles in the press, and were privileged to respond to those attacks in self defense.[5] Thus, "the dispositive issue in this case, as in most cases involving an assertion of qualified privilege, is whether there has been sufficient evidence of malice to

---

5. Although the District of Columbia cases do not expressly set out the requirements for coming within the protection of the self-defense privilege, they do establish the elements of the related "common interest" privilege. To be protected by that privilege, "the statement must have been (1) made in good faith, (2) on a subject in which the party communicating has an interest ... , (3) to a person who has such a corresponding interest." *Moss v. Stockard,* 580 A.2d 1011, 1024 (D.C. 1990). For essentially the same reasons discussed below, those requirements are satisfied here. BAEF made the statement in the good-

faith belief that it was necessary to protect the interests of the Fund from what it saw as a false and potentially damaging attack on its reputation for fair dealing, and sent it to those with either an interest in or business dealings with the Fund. While " '[e]xcessive publication,' defined as publication to those with no common interest in the information communicated, or publication not reasonably calculated to protect or further the interest, will render [a] statement non-privileged," *id.,* for the reasons discussed in Part III(B), we do not find BAEF's statements to have been excessively published.

overcome the privilege." *Columbia First,* 665 A.2d at 656. The burden of proof to make that showing rests on the plaintiff. *Mosrie,* 467 A.2d at 477; *Altimont,* 374 A.2d at 290.

 District of Columbia law makes it very difficult for a plaintiff to overcome a qualified privilege. As the Court of Appeals has made clear, the common-law malice necessary to overcome the self-defense privilege is considerably different from the "actual malice" necessary to overcome the First Amendment privilege. The latter requires publication with knowledge that a statement was false or with reckless disregard as to whether it was false. *See Moss v. Stockard,* 580 A.2d 1011, 1026 n. 29 (D.C.1990) (citing *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). Common-law malice, by contrast, "emphasize[s] bad faith and evil motive." *Id.; see Mosrie,* 467 A.2d at 477. It is "the doing of an act without just cause or excuse, with such a conscious indifference or reckless disregard as to its results or effects upon the rights or feelings of others as to constitute ill will." *Moss,* 580 A.2d at 1025; *Mosrie,* 467 A.2d at 477. And "unless the statement itself is 'so excessive, intemperate, unreasonable, and abusive as to forbid any other reasonable conclusion than that the defendant was actuated by express malice,' malice must be proven by extrinsic evidence." *Moss,* 580 A.2d at 1024 (quoting *Ford Motor Credit Co. v. Holland,* 367 A.2d 1311, 1314 (D.C.1977)); *see Columbia First,* 665 A.2d at 656.

 Moreover, "the mere existence of ill will on the part of the publisher toward the subject of the publication does not defeat the publisher's privilege if the privilege is otherwise established by the occasion and a proper purpose." *Mosrie,* 467 A.2d at 477. Rather, the "court looks to the primary motive by which the defendant is apparently inspired; and, the fact that he feels resentment and indignation towards the plaintiff and enjoys defaming him will not forfeit the privilege so long as the primary purpose is to further the in-terest which is entitled to protection." *Id.* at 477–78; *see Columbia First,* 665 A.2d at 656. Most significantly,

> if the language of the communication and the circumstances attending its publication by the defendant are as consistent with the nonexistence of malice as with its existence, there is no issue for the jury, and it is the duty of the trial court to direct a verdict for the defendant.

*Mosrie,* 467 A.2d at 478 (quoting *National Disabled Soldiers' League, Inc. v. Haan,* 4 F.2d 436, 441–42 (D.C.1925)); *see Altimont,* 374 A.2d at 291; *Dickins,* 171 F.2d at 25.

## A

 In this case we cannot deduce the necessary malice from BAEF's words alone. To be sure, the Fund's description of the Novecon lawsuit as an attempt "to extort $200,000 of U.S. taxpayer money from the BAEF," and its description of the problems over land title as "a veritable 'Brooklyn Bridge' of misrepresentation," were harsh and intemperate. But we cannot say that the statement was " 'so excessive, intemperate, unreasonable, and abusive as to forbid any other reasonable conclusion than that the defendant was actuated by express malice.' " *Moss,* 580 A.2d at 1024 (quoting *Ford Motor,* 367 A.2d at 1314).

We cannot say so particularly because the statements the District of Columbia Court of Appeals found protected by the self-defense privilege in *Mosrie v. Trussell* were at least as harsh and intemperate as those at issue here. In that case, the *Washington Post* had reported a series of complaints of incompetence and racism against Trussell, the Deputy Chief of the Metropolitan Police Department, made by members of the Homicide Branch. The Chief of Police asked Trussell to respond to the complaints. Trussell responded by making allegedly defamatory statements about Mosrie, the commander of the Homicide Branch, whom he suspected of being the source of the *Washington Post* article.

Specifically, these statements included Trussell's suspicion that Mosrie was:

> manipulating his pay records, running his outside businesses on police time, using his police cruiser for personal business; and that he was often absent from work, did not respond to investigations after normal working hours and was not adequately informed as to homicide investigations.

*Mosrie,* 467 A.2d at 477. Notwithstanding the court's description of these statements as "alleged dereliction of duty and possible criminal abuses," the court concluded that "[a]ny finding of malice would be based only on speculation, which is not sufficient to send the issue to the jury." *Id.* at 478. "Mere vehemence, even exaggerated statements ... will not," the court observed, "destroy the privilege or necessarily present a question of fact." *Id.* at 479 (quotation omitted). Moreover, notwithstanding that plaintiff had shown "evidence that Trussell's communications were inspired by resentment and indignation at Mosrie," the court held, he was still "privileged to explain to ... the Chief his opinion as to the motivations behind the list of complaints against him." *Id.* Because "at most, the evidence [was] as consistent with the nonexistence of malice on the part of Trussell toward Mosrie as it [was] with the existence," the court concluded that a directed verdict against the plaintiff was in order. *Id.* at 480.

Although BAEF's characterization of Novecon as attempting to "extort" taxpayer money and to sell it the "Brooklyn Bridge" was harsh, it was no harsher than Trussell's leveling of charges of "criminal abuses" against another police officer. While Novecon contends that the reader would interpret BAEF's letter as literally charging it with a crime (extortion), we think that unlikely. The context of the statement, which was contained in a cover letter to a package of material including the original *Wall Street Journal* article, made clear to the reader that the reference was to Novecon's civil lawsuit and not to some nefarious scheme. Such usage is perfectly consistent with dictionary defini-

tions of "extort." *See, e.g.,* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 806 (1986) (defining extort as "to obtain from an unwilling or reluctant person by importunity, argument or ingenuity ... <she did at last [extort] from her father an acknowledgment that the horses were engaged—Jane Austen>").

Indeed, the statement at issue here is quite close to that considered by the Supreme Court in *Greenbelt Cooperative Publishing Assoc. v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970). There, a developer was accused of "blackmail[ing]" the city council to obtain a zoning variance by simultaneously negotiating to sell the city a piece of desirable real estate. "It is simply impossible to believe," the Court said, "that a reader who reached the word 'blackmail' in either article would not have understood exactly what was meant: it was Bresler's [the developer's] public and wholly legal negotiating proposals that were being criticized." *Id.* at 14, 90 S.Ct. 1537. The court continued:

> No reader could have thought that [the defendants] were charging Bresler with the commission of a criminal offense. On the contrary, even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable.

*Id.*

As with the use of "blackmail" in *Greenbelt,* here the word "extort" was used as "a vigorous epithet" by "those who considered" Novecon's litigating position "extremely unreasonable." And there can be no question that BAEF actually believed that Novecon's litigating position—its claim that BAEF had breached a binding contract and so should pay it $200,000—was unreasonable. BAEF vigorously defended itself against Novecon's contract claim in the district court, and we have upheld that defense. Accordingly, we cannot find that BAEF's choice of epithets "'forbid[s] any other reasonable conclusion than that the defendant was actuated by

express malice.'" *Moss*, 580 A.2d at 1024 (quoting *Ford Motor*, 367 A.2d at 1314).[6]

**B**

■ As BAEF's statement is insufficient on its own to establish malice, Novecon must prove malice "by extrinsic evidence." *Moss*, 580 A.2d at 1024 (quoting *Ford Motor*, 367 A.2d at 1314). Having no direct extrinsic evidence of ill will on the part of BAEF, Novecon turns to circumstantial evidence.

The first piece of circumstantial evidence offered by Novecon is the fact that "defendants made their defamatory attack on plaintiffs for statements made by a third party." Novecon Br. at 14. "Neither Novecon nor Dr. Rahn," plaintiffs contend, "were the sources of the Rushford article." Hence, the "counter attack was against the wrong party."[7] *Id.* But Novecon cites no case for the proposition that the self-defense privilege may be wielded only where the plaintiff is the known attacker. Since the attacks specifically referred to the Novecon matter—as an example of BAEF's "arrogance," "shoddy performance," or worse—any reply would have had to respond to the charges concerning BAEF's dealings with Novecon, regardless of the source of those allegations.

Moreover, *Mosrie* suggests that the privilege is not limited to replies to known attackers. Although Trussell "suspected" Mosrie of being the source of the critical *Washington Post* article, Mosrie apparently was not named in the article. Here, BAEF certainly suspected that Novecon and Rahn were the sources for Rushford's

*Wall Street Journal* article. Regardless whether that was true, the suspicion was not unreasonable in light of the parallels between the article's charges and those contained in both Rahn's letters to Congress and the two-page draft the American Ambassador gave to BAEF. In addition, Ronald Utt, Novecon's managing director, was quoted by name in the Rushford article. Under District of Columbia law, BAEF was therefore "privileged to explain ... [its] opinion as to the motivations behind the list of complaints against" it. *Mosrie*, 467 A.2d at 480. It "had the right to repel the attack ... and to retort upon its assailant if such retort was a necessary part of its defense or fairly arose out of the charges made against" it. *Id.* at 479 (quotation omitted).

Novecon's second piece of circumstantial evidence of malice is the fact that BAEF sent its letter to 570 people in the United States and Bulgaria. Novecon contends that this response was so disproportionate as to be "alone sufficient evidence to support a jury inference of malice." Novecon Br. at 17. BAEF's single letter to the editor of the *Wall Street Journal*, Novecon notes, was a measured response. The 570 letters, however, assertedly took the response outside the scope of the privilege.

The district court disagreed, as do we. As the court said, "the common law qualified privilege asserted here does not demand that defendants demonstrate failsafe precision in identifying third parties with a sufficient interest in BAEF's public controversy." 977 F.Supp. at 50.[8] BAEF sent its letter to "U.S. government agencies, Bulgarian officials, and actual and

---

6. We reach the same conclusion with respect to the use of the "Brooklyn Bridge" metaphor to describe, inter alia, the dispute over the Batsovs' title to the property. As the district court found, the term was "a figure of speech that reflected the defendant's assessment of Novecon's contract offer, obviously subject to many debatable interpretations." *Novecon II*, 977 F.Supp. at 51.

7. Plaintiffs do not dispute that Rahn was the author of the letter sent to members of Congress. At oral argument they suggested that the letter could not trigger a right of reply

because Rahn had the right to petition Congress. Yet, even if that right would have given Rahn his own privilege in the event BAEF had sued him for defamation, plaintiffs cite no case for the proposition that the fact an attack is communicated to Congress deprives a citizen of the common-law privilege of self-defense.

8. The Restatement (Second) of Torts states:

If on an occasion giving rise to a conditional privilege the publisher mistakenly communicates the defamatory matter to some

potential business relations within the Bulgarian private sector." *Id.* at 49. Specifically, the Fund "attempted to reach persons whose opinions of BAEF were, or reasonably could have been, affected by plaintiffs' comments and the ensuing wave of negative publicity." *Id.* at 50. Approximately five hundred of the letters went to Bulgaria, with all but a handful of those going to borrowers from the Fund. Bauer Aff. ¶ 91 (J.A. 472); Schiller Aff. ¶ 59 (J.A. 726). BAEF could not limit itself to readers of the *Wall Street Journal,* because the Rushford article had been republished in the Bulgarian press and Novecon had sent its own letters directly to members of Congress. As the district court explained, "defendants mailing to several hundred addressees must be viewed in light of the negative press coverage BAEF received in Bulgarian and international newspapers, reaching tens of thousands of readers." 977 F.Supp. at 55–56. *Compare Dickins,* 171 F.2d at 23–25 (finding no showing of malice where Teamsters' union responded to critical newspaper articles by attacking critics in Teamsters magazine sent to "400,000 Teamsters and about 1,200 others, including all members of Congress, a number of colleges, libraries, newspapers and other periodicals").

 Finally, we reject Novecon's assertion that the district court improperly denied its request for discovery, under Federal Rule of Civil Procedure 56(f), of the names of the 570 recipients of BAEF's letter. We review such claims under an abuse of discretion standard. *See Paquin v. Federal Nat'l Mortgage Assoc.,* 119 F.3d 23, 28 (D.C.Cir.1997). Plaintiffs' principal

argument is that the names could have shown "that BAEF's letter may have reached too broad an audience to constitute a reasonable defense of its reputation." *Novecon II,* 977 F.Supp. at 55. But as the district court noted, BAEF did disclose the categories of recipients (e.g., members of Congress, borrowers from the Fund, etc.). *Id.* at 56. Given that level of disclosure, and the leeway a defendant has to determine those to whom it must reasonably communicate its response, we cannot dispute the district court's conclusion that production of the names was not—as required by Rule 56(f)—"essential to justify [Novecon's] opposition" to summary judgment. *Id.* at 54, 55–56.

## C

In sum, we conclude that because no reasonable factfinder could find that "the language of the communication and the circumstances attending its publication by the defendant" were not at least "as consistent with the nonexistence of malice as with its existence, there is no issue for the jury." *Mosrie,* 467 A.2d at 478 (quoting *National Disabled Soldiers',* 4 F.2d at 441–42); *see Altimont,* 374 A.2d at 292. It therefore was "the duty of the trial court to direct a verdict for the defendant" on Novecon's claim of defamation. *Mosrie,* 467 A.2d at 479.

## IV

For the foregoing reasons, the judgment of the district court is affirmed.[9]

---

person to whom he is not otherwise privileged to publish it, he is protected if ... he reasonably believes that the person to whom he communicates it is a person whose knowledge of the matter would be useful in the protection of the interests in question.

Restatement (Second) of Torts § 604 cmt. e (1977) (quoted in *Novecon II,* 977 F.Supp. at 50).

9. Although BAEF filed counterclaims against Novecon, it advised the district court that it would withdraw them if its motion for summary judgment were granted in full. Because the district court granted BAEF's motion, it dismissed the counterclaims. 967 F.Supp. at 1391; 977 F.Supp. at 52. The Fund has filed a cross-appeal of that dismissal, but states that it seeks reinstatement only if we reverse the district court's judgment. BAEF Br. at 39; BAEF Reply Br. at 1–2. Because we have affirmed that judgment, we treat the

cross-appeal as waived and direct that it be dismissed.